Judge McMahon

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **WILLIAM H. SANDERS, on behalf of Himself and all others similarly situated,** : | **11 CIV 0864** |

**WILLIAM H. SANDERS, on behalf of** :
**Himself and all others similarly situated,** :

                                    :      **Index No.:**_____

            **Plaintiff,**         :      ECF CASE
                                    :      _____, Part _____
**vs.**                             :      **Justice:** Colleen McMahon
                                    :
                                    :      **CLASS ACTION COMPLAINT.**
**FOREX CAPITAL MARKETS, LLC,**     :      [1] CIVIL RICO: 18 U.S.C. § 1962(c)
                                    :      [2] VIOLATION OF NEW YORK
            **Defendant.**          :          GENERAL BUSINESS LAW 349(h)
                                    :      [3] VIOLATION OF GENERAL BUSINESS
                                    :          LAW 350
                                    :      [4] BREACH OF CONTRACT
                                    :      [5] BREACH OF IMPLIED COVENANT OF
                                    :          GOOD FAITH AND FAIR DEALING
                                    :
                                    :      **DEMAND FOR JURY TRIAL**
_____     :

RECEIVED FEB 08 2011 U.S.D.C. S.D.N.Y. CASHIERS

        Plaintiff, WILLIAM H. SANDERS (hereinafter, "Plaintiff" or "Sanders"), on

behalf of himself and all others similarly situated, sues Defendant, FOREX CAPITAL

MARKETS, LLC (hereinafter, "Defendant" or "FXCM"), and alleges:

                              **INTRODUCTION**

        1.      Plaintiff, William H. Sanders, just like thousands of other customers, was

lured into transacting business with Defendant, FXCM, buying and selling foreign

currencies in what is known as the foreign exchange ("Forex") market, but little did

Sanders, or any of the others, know that FXCM intended to, and did, systematically bilk

them out of their account money through an elaborate scheme of fraudulent tricks,

devices, and artifices.  What was represented to Sanders and others as a foreign currency

trading platform developed upon professed principles of "fairness, honesty, and

integrity," which was supposedly rooted in providing customers with a true market

trading experience, totally devoid of dealer intervention and market manipulation, was in truth a platform predicated upon deceit and trickery that systematically looted the accounts of customers who, like Sanders, placed their trust in FXCM.

2.     The scheme deployed by FXCM was complex and varied, utilizing aggressive and pervasive marketing and advertising campaigns, including television, internet, seminars, webinars, and other media, portraying FXCM as a foreign currency trading platform where investors could trade foreign currencies in a true market environment.  The advertisements were specifically targeted to convey a sense of trust and transparency to potential FXCM customers and to gain the customers' confidence in FXCM's trading platform.  To further bolster customers' confidence in its platform, FXCM enticed customers to use FXCM's practice or demo account (hereinafter, the "Demo Account") to simulate an FXCM trading experience.  But the Demo Account, just like the myriad advertisements, misled customers about the true nature, functionality, and performance of the platform. Once lured into opening an account, customers were subjected to a staggering array of stratagems and ploys, some using extremely sophisticated computer software based upon complex algorithms and high-speed computers, to deceive the customers into believing that their trading was being affected by normal market forces, while in reality FXCM traded against its own customers.

3.     And the so-called "Demo Account" – which was held out by FXCM as the sine qua non to persuade prospective customers to trade with FXCM – was the most cunning and crippling canard of all.  By trading through the "Demo Account" without being at financial risk, the customer was allowed to experience direct market pricing, free from FXCM dealer interference or manipulation.  The switch pulled by FXCM on how

trading occurs once the customer opens a "live" account and starts trading with real money, is nothing short of a modern-day equivalent of the classic street con game known as "Three-card Monte." Once "live" trading began, direct market pricing was replaced by profound dealer interference and trade manipulation.

4.      To further its fraudulent practices, FXCM associated with software developers and programmers to create and deploy one of the most sinister software applications ever imagined, the central component of which included a back-end administrative console that provided FXCM an arsenal of system commands to facilitate FXCM's fraud on customers. For example, through this console, FXCM can prevent the customer from closing out a profitable trade; hold up a trade so that FXCM can pirate the profit by trading against the customer; or manipulate the price of the market by utilizing "flash" trades to artificially move a market to close out a customer's "stop order." FXCM deployed these technological tricks to separate customers, like Sanders, from their money.

5.      Accordingly, Plaintiff brings the present class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b) (2) and 23(b) (3), seeking monetary, declaratory, and injunctive relief for himself and the class he seeks to represent, consisting of all individuals in the United States who have been victimized by Defendant's false and deceptive trade practices, and fraudulent, unfair trade execution and account handling practices.

## JURISDICTION AND VENUE

6.      This action arises under the laws of the United States, in particular, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*.

Complaint and Demand for Jury Trial

Accordingly, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 1964, and 18 U.S.C. § 1961 *et seq*.

7.      This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

8.      This Court has further jurisdiction over the parties and the subject matter of this class action pursuant to 28 U.S.C. § 1332(d) because: (a) there is diversity of citizenship between at least one member of the class and Defendant; and (b) the amount in controversy exceeds $5 million, exclusive of interest and costs.

9.      Venue is proper in this district pursuant to 18 U.S.C. § 1965(a) and U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to this action occurred in this district and because Defendant transacts business in this district. Furthermore, venue is proper in this Federal District because Defendant is deemed to reside in this Federal District pursuant to 28 U.S.C §1391(c).

## PARTIES

10.      Plaintiff, William H. Sanders, is a natural person, and at all times relevant to this complaint resided in Muscogee, Oklahoma.

11.      Defendant, FXCM, is a self-proclaimed global online provider of off-exchange foreign exchange (Forex) trading and related services to retail, institutional, and individual customers worldwide.   FXCM is incorporated in Delaware and is headquartered at Financial Square 32 Old Slip, 10th Floor, New York, NY 10005 USA.

Complaint and Demand for Jury Trial

## FACTUAL BACKGROUND

12.     At all times material hereto, Plaintiff was an individual residing in Oklahoma, and was a customer of Defendant, FXCM.

13.     Defendant is a registered Futures Commission Merchant ("FCM"), a registered Retail Foreign Exchange Dealer ("RFED"), and a Foreign Dealer Merchant ("FDM") as those terms are defined by the National Futures Association ("NFA"). Defendant is also a regulated member of the NFA.

*The Foreign Exchange Market*

14.     The Forex market is a worldwide, off-exchange financial market for the trading of currencies, which began in the 1970s and is currently the largest and most liquid financial market in the world.  The primary purpose of the foreign exchange market is to assist international trade and investment by allowing businesses and individuals to convert one currency to another currency.  To support these transactions, financial centers around the world function as anchors of trading between a wide range of different types of buyers and sellers.

15.     Forex trading functions much like the over-the-counter market for stocks. That is, Forex trades do not take place on a regulated exchange, and there is no central marketplace for buyers and sellers to clear their trades.   The primary participants in Forex trades are large institutional investors who trade with each other in what is known as the inter-bank market.  Within the inter-bank market, Forex trades are executed with narrow spreads, meaning that there is a negligible difference between the bid and ask prices.

16.    Investing in the foreign exchange market was initially within the exclusive purview of these large institutional investors such as pension funds, insurance companies, mutual funds, hedge funds, investment banks, and multinational corporations.  However, over the past ten years or so, due to growth of the internet and online trading systems, it has become possible for individual investors to trade in the off-exchange foreign currency market.  Individual investors can now do so by participating indirectly in the Forex market through a dealer counterparty, or retail broker, such as Defendant.  Retail brokers are often referred to as "market makers" because they make their own market and fix the prices they offer to individual traders.

*Defendant's Marketing Practices*

17.    Defendant aggressively promotes itself and its products through television, internet, direct mail, seminars, webinars, and other advertising media, for the purpose of attracting individuals to sign up as customers, and for the purpose of inducing customers to actively trade foreign currencies using its electronic trading platform.

18.    To attract customers to open accounts and use its trading platform, Defendant employs an aggressive sales and marketing campaign touting its transparency, its speed of trade execution, and its fair business practices.  This marketing campaign has spanned many years and continues to this day, and includes internet and direct mail advertising, as well as seminars, webinars, and other marketing media.  In addition, Defendant has used, and continues to use, a wide network of "Introducing Brokers" to refer customers to it for a fee or commission, and has provided, and continues to provide, financial rewards to the various designers of its trading platform for directing customers to Defendant.

19.    Also as a part of its aggressive sales and marketing strategy, Defendant offers the use of a "Demo," "Paper Trading," or "Practice" account (collectively referred to hereinafter as "Demo Account") whereby potential customers can try out Defendant's trading platform, purportedly simulating actual trading activity, but without risking real money.   Defendant represents that the Demo Account will mirror actual trading conditions and will function as a training tool simulating real-world trading conditions. For example, Defendant touts on its website that, "[t]he most valuable tool . . . is the FXCM Demo Account, which allows you to test out strategies and learn from your mistakes without risking real money."

20.    In actuality, Defendant engages in series of dishonest trade execution practices that are never disclosed to consumers.   While Defendant's marketing materials represent that Defendant will provide customers with fair trade execution, where gains and losses are determined by the skill of the trader and genuine movement of the market, Defendant's dishonest trade execution practices are designed to cause a customer to lose money no matter how skillful the customer may be in executing trades.   Furthermore, the trading experience the customer receives using the Demo Account is not at all like the trading experience the customer receives when using Defendant's actual trading platform as Defendant's actual trading platform is a "rigged game," which has been designed by Defendant, and its middleware/software developers, to allow Defendant to interfere with and manipulate customers' trades so as to systematically "loot" Defendant's customers' accounts through its dishonest trading practices.   Thus, Defendant deliberately misleads prospective customers by giving them a false impression of the trading experience the

Complaint and Demand for Jury Trial

customer can expect when using a "Live" Forex trading account (hereinafter, "Live Account").

21.    Defendant further deceives customers by failing to disclose its dishonest practices in its disclaimers contained in Defendant's customer agreements. Buried in the fine print of Defendant's lengthy, misleading, contradictory, and largely incoherent computer-generated customer agreement, Defendant purports to innocuously "disclose" and "disclaim" to the customer that, at times, the Defendant *may* act as a "principal" in transactions, which *may* result in the customer's not getting the "best price" on certain trades.  In fact, Defendant does not act as a "principal" in a "market" at all; rather, the Defendant acts as a well-armed and unscrupulous adversary to its customer, with superior knowledge, a technological advantage, one which ignores its own Code of Conduct, and which intentionally defrauds unwitting customers.

*Defendant's Trading Platform*

22.    Defendant's trading platform consists of several integrated parts.  The front-end, or user interface, that must be downloaded and installed on the customer's individual computer.  Unseen by the customer, Defendant's trading platform also consists of back-end software that receives customer orders, provides customers with pricing information, executes trades, and otherwise provides all of the various features and functions Defendant makes available to its customers.  In the middle of this platform is "middleware," which is designed to, among other things, translate the information provided by the customer into a form usable by Defendant's back-end software and to provide pricing and trading information from Defendant's back-end software in a form usable by the customer software.  During the times relevant to the present complaint,

Defendant primarily supported two versions of software, MetaTrader 4 and Trading Station II.

23.    Defendant has engaged the services of various software companies, including, but not limited to, Boston Technologies, as well as the services of individual software programmers, to modify the various components of its trading platform to allow it to engage in the dishonest trading practices described below.

24.    Defendant has worked with these software companies and individual software programmers to modify its back-end systems and middleware to enable it to engage in the dishonest trading practices described below. Defendant has modified its trading platform so that many of these dishonest trading practices are applied to a customer's account by automated computerized algorithms. Through this association, Defendant has also modified its trading platform to include a sophisticated back-end administrative console which provides Defendant and its employees a series of system commands designed, each accessible through a drop down menu, to execute many of the dishonest trading practices described below. All of these software modifications have been implemented by Defendant to prevent customers from making money and to cause customers to lose money to Defendant.

*Defendant's Dishonest Trading Practices*

25.    Defendant's dishonest trading practices include, but are not limited to, the following:

> a. **<u>Slow Server Command:</u>**  When a customer is engaged in profitable trading activity, Defendant routes the customer's account to a "slow server," causing trade execution to be slowed down, and allowing

Defendant the time to hijack any potential profit in the trade by buying and selling in-between the customer's order and the real market, with Defendant's taking any profit and leaving the customer victimized with no money for his or her effort;

b. **False "Error" Messages:**   Defendant uses its administrative back-end software to prevent the customer from closing out a profitable trade and instead causes the trading system to generate any one of a series of "error" messages to the customer, blocking the customer's efforts to finalize what would have been a profitable order;

c. **Flash Trades:**   Defendant, in a practice known as "stop hunting," manipulates the market price of the traded currency, including printing bogus "flash trades" which move the "market" to trigger the customer's stop order for a given trade, essentially closing the customer out of that trade;

d. **Arbitrary Margin Rules:**   Defendant arbitrarily changes the margin rules on Fridays for an ensuing week without any notice to the customer, which results in the customer's being deprived of any trading advantages or leverage opportunities they may have, and again causing the customer's account to be closed out in favor of Defendant;

e. **Abuse of "Slippage":**   Defendant, in a practice known as "slipping a trade," takes advantage of "slippage" in a given trade.  "Slippage" is the change in price between the time when a price is quoted and a market order is placed.  It is customarily caused by market movement while the

10

trade is being executed. The incidence of "slippage" should roughly be equal in favor of the customer and the broker. Defying all laws of probability, in almost every case, Defendant's customers suffer losses as a result of "slippage" at grossly greater percentages than Defendant does, which can only be explained by Defendant's manipulation of pricing; and

**"Slow Fill" and "No Fill" Commands:** Defendant often fails to execute valid and profitable trade orders entered by the customer and instead causes the trading system to generate a "slow fill" or "no fill" message to the customer as the customer attempts to close out a profitable trade, preventing the customer from making a profit while generating illicit profits for Defendant.

*The Harm to Consumers*

26. Defendant has used the above-described methods to systematically misappropriate hundreds of millions of dollars from hundreds of thousands of unsuspecting customers, including Plaintiff herein, and the class of individuals he seeks to represent. As a direct and proximate result of this massive fraud, Plaintiff, and others similarly situated, including thousands, if not hundreds of thousands, of unsuspecting customers, have suffered damages.

**CLASS ACTION ALLEGATIONS**

27. Pursuant to Rule 23 of the Federal Rules of Civil procedure, Plaintiff, on behalf of himself and all others similarly situated, seeks to certify a national Class defined as follows:

> All persons in the United States who contracted with
> Defendant to trade foreign currencies on Defendant's over-
> the-counter, off-exchange, trading platform from January 1,
> 2005 to Present, and whose accounts were subjected to
> Defendant's fraudulent and unfair trade execution and
> account handling practices (hereinafter the "Class" or
> "Class Members").

28.     FXCM is the largest and fastest growing retail, online, over-the-counter,

Forex dealer in the United States.  In 2005, FXCM had over 55,000 retail accounts.  By

2006, FXCM had over 78,000 accounts trading through its platforms, and, in 2007 and

2008, that number increased to over 100,000 tradable accounts.  In 2009, FXCM

continued to grow its tradable accounts, which increased to more than 150,000.  More

recently, as of September 30, 2010, FXCM had over 174,000 accounts trading through its

platforms from over 180 countries, with an average of over 6,700,000 trades executed

each month.  As a result of FXCM's significant growth over the years, the members of

the Class are so numerous that joinder is impracticable and would involve thousands, if

not hundreds of thousands, of individual actions.

29.     The identities of the individual Members of the Class are ascertainable

through, among other things, Defendant's internal records.  Members of the Class may be

notified of the pendency of the Class Action by numerous reasonable means, including

mail, e-mail, internet, publication and other means.

30.     Common questions of law and fact exist and predominate over any issues

affecting only individual Class Members.  Common issues of law and fact include, but

are not limited to:

    a.  Whether Defendant engaged in deceptive or fraudulent acts and practices
        described herein;

12

b.  Whether Defendant engaged in conduct actionable under the RICO statute;

c.  Whether Defendant, Plaintiff, and Class Members were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3);

d.  Whether the "FXCM Fraud Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4);

e.  Whether Defendant was, and is, a "person" who conducted the affairs of the "FXCM Fraud Enterprise" described below, through the "pattern of racketeering activity" described below;

f.  Whether Defendant has engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5);

g.  Whether Defendant has engaged in "racketeering activity" indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud), as described below;

h.  Whether Plaintiff and each Member of the Class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c);

i.  Whether Plaintiff and Members of the Class have been injured in their business or property as a direct and proximate result of Defendant's illegal conduct in violation of 18 U.S.C. § 1962(c);

j.  Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under the RICO statute;

k.  Whether Defendant knowingly and purposely worked with the middleware/software companies, and individual programmers, to create software based upon algorithms designed to allow Defendant to engage in the deceptive and fraudulent acts described herein;

l.  Whether Defendant's scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiff and Class Members;

m.  Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under New York General Business Law § 349;

n.  Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable under New York General Business Law § 350;

o.  Whether Defendant is liable to for damages Plaintiff and Class Members for conduct actionable as a breach of contract; and

p.  Whether Defendant is liable for damages to Plaintiff and Class Members for conduct actionable as breach of the implied covenant of good faith and fair dealing.

31.  Plaintiff's claims are typical of the claims of the proposed Class, and Plaintiff will fairly and adequately represent and protect the interests of the proposed Class.  Plaintiff does not have any interests antagonistic to those of the Class.  Plaintiff has retained competent and experienced counsel in the prosecution of this type of litigation.

32.    Defendant has acted on grounds generally applicable to the Class by engaging in acts of market/account manipulation and an aggressive uniform national marketing and advertising campaign containing false, deceptive, and fraudulent representations, and inadequate disclosures, thereby making injunctive or declaratory relief applicable with respect to the Class as a whole.

33.    A class action is also superior to other available methods for the fair and efficient adjudication of this controversy because Class Members number in the thousands, if not hundreds of thousands, and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class Members to prosecute their claims individually.  Trial of Plaintiff's and Class Members' claims is manageable, and economies of time, effort, and expense will be fostered and uniformity of decisions will be insured.

34.    Most individual Class Members have little ability to prosecute an individual action due to the complexity of the issues involved in this litigation and the significant costs attendant to litigation on this scale compared to the damages suffered by individual Class Members.

35.    Unless a class is certified, Defendant will continue to unlawfully engage in acts of market/account manipulation and an aggressive uniform national marketing and advertising campaign containing false, deceptive and fraudulent representations, and inadequate disclosures.  Unless a class-wide injunction is issued, Defendant will continue to violate the law.

## ACCRUAL, FRAUDULENT CONCEALMENT, CONTINUING VIOLATION AND EQUITABLE TOLLING

36.     Plaintiff and Class Members did not know, and could not reasonably have known, of Defendant's deceptive Forex trading practices described herein.

37.     Defendant's deceptive Forex trading practices were inherently self-concealing, and Defendant has repeatedly elected to continue the concealment of its deceptive practices.

38.     To further the active and fraudulent concealment of this deception, Defendant employed the use of software that has been meticulously and cleverly designed to systematically cause customers to engage in losing currency trades to Defendant, and Defendant has used this technological advantage, completely ignoring its own Code of Conduct, to essentially steal money from its customers for years.  Defendant knew Plaintiff and Class Members could not obtain information about these deceptive practices.  Defendant's use of this software was undiscoverable to Plaintiff and Class Members, and included, but was not limited to, the following:

a.  Sending a series of "error" messages to the customer, thereby blocking the customer's efforts to finalize a profitable order;

b.  Manipulating the market price of the traded currency, including printing bogus "flash trades" that move the "market" to trigger the customers stop order for a given trade;

c.  Causing the customer to receive a "slow fill" or "no fill," response as the customer attempts to close out a profitable trade;

Complaint and Demand for Jury Trial

d.  Routing the customer's account to a "slow server," causing trade execution to be systematically slowed down, and allowing Defendant the time to hijack any potential profit in the trade, by buying and selling in-between the customers order and the real market, with Defendant's taking all profits, leaving the customer victimized;

e.  Arbitrarily changing the margin rules without any notice to the customer; and

f.  Offering use of the Demo Account described herein, which Defendant deceptively marketed as simulating actual trading activity without risking real money, only to have different results upon funding Live Accounts due to market/account manipulation by Defendant.

39.     Defendant has implemented various methods to avoid detection of its deceptive Forex trading and account handling practices, including through its uniform national deceptive marketing and advertisement campaign in which Defendant has held itself out as a fair and balanced foreign trading "market" when, in fact, Defendant's marketing business practices are nothing more than a scheme to lure unsuspecting customers into a web of deceit so that Defendant can systemically manipulate the market and profit from its deception to the detriment of its customers.

40.     Defendant also employed the Demo Account described herein to actively conceal its deceptive Forex trading and account handling practices. Specifically, after an unsuspecting customer tried the Demo Account, he or she was aggressively marketed by Defendant to deposit money, and begin trading in the "real market" when, in fact, there was no "real market" and, as soon as the customer began "live" trading, Defendant

immediately deployed the cunning and unconscionable tricks described above to systematically steal the customer's money.

41.     Alternatively, if Plaintiff or Class Members were suspecting of Defendant's deceptive Forex trading practices, even in the exercise of due diligence, Plaintiff and Class Members could not have discovered information critical to the claim herein.  Defendant has sole knowledge of its deceptive Forex trading practices, which it actively conceals through misrepresentations in its marketing and advertisements, through use of the Demo Account described herein, and through use of technologically advantageous software meticulously designed to deceive customers, all of which are designed to allay customers' concerns about the trading platform.  Further, Defendant has never disclosed these deceptive practices to Plaintiff or Class Members, instead, holding itself out as a fair and balanced foreign trading "market" free from market/account manipulation.

42.     Defendant has actively concealed its deceptive Forex trading practices and other wrongful conduct in order to prevent, and indeed has succeeded in preventing, Plaintiff and Class Members from discovering these deceptive practices.

43.     For the reasons alleged above, Members of the Class are still unaware they have been and continue to be injured by Defendant's deceptive conduct.

44.     The statute of limitations applicable to any claims Plaintiff or Class Members have brought or could bring as a result of the unlawful and fraudulent concealment and course of conduct described herein has been tolled as a result of Defendant's fraudulent and active concealment.  In addition, Plaintiff and Class Members did not discover, and could not have discovered, that they had been subjected to

actionable misconduct until shortly before the filing of this Complaint, thereby tolling any applicable statute of limitations. Defendant, through the various devices of concealment and secrecy described above, affirmatively and fraudulently concealed the existence of its unlawful and deceptive Forex trading scheme and course of conduct from Plaintiff and Class Members. Plaintiff and Class Members had no knowledge of Defendant's scheme and unlawful conduct and did not learn of, or discover, Defendant's fraudulent course of conduct until the filing of this action.

## NAMED PLAINTIFF'S ALLEGATIONS

45. Plaintiff, William H. Sanders, entered into a contractual agreement with Defendant in 2004 to trade on Defendant's Forex platform.

46. Prior to entering into a contractual agreement to trade on Defendant's Forex platform, Sanders traded on Defendant's Demo Account for approximately one month. While using the Demo Account, as a result of Defendant's deceptive and fraudulent advertisements described herein, Sanders formed the reasonable belief that the Demo Account provided an accurate portrayal of the trading experience he would receive once he started trading on a Live Account with Defendant.

47. When Sanders switched from the Demo Account to the Live Account, Sanders experienced many of the deceptive practices employed by Defendant, described herein, including, but not limited to, slippage and server delays. He did not experience these deceptive practices while trading on Defendant's Demo Account.

48. While trading with Defendant, Sanders used the MetaTrader 4 platform powered by Boston Technologies.

49.     Sanders traded on Defendant's Forex platform from 2004 until 2008. During that time, Sanders lost approximately more than **$150,000.00**.

## COUNT I
### CIVIL RICO: 18 U.S.C. § 1962(c)

50.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51.     This cause of action asserts claims against Defendant for violations of 18 U.S.C. § 1962(c) for conducting the affairs of the "FXCM Fraud Enterprise" described herein, through the "pattern of racketeering activity" described herein.

52.     During the Class Period, Defendant, Plaintiff, and Members of the Class were and are each a "person," as that term is defined in 18 U.S.C. § 1961(3).

53.     During the Class Period, Plaintiff and each member of the class were and are each a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

54.     During the Class Period, Defendant was, and is, a "person" who conducted the affairs of the "FXCM Fraud Enterprise" described below, through the "pattern of racketeering activity" described below.  While Defendant participates in the FXCM Fraud Enterprise, it has an existence separate and distinct from the enterprise.   Further, the FXCM Fraud Enterprise is separate and distinct from the "pattern of racketeering activity" in which Defendant has engaged and is engaging.

55.     During the Class Period, Defendant was associated with, operated or controlled, the FXCM Fraud Enterprise, and Defendant participated in the operation and management of the affairs of the FXCM Fraud Enterprise, through a variety of actions

described herein. Defendant's participation in the FXCM Fraud Enterprise is necessary for the successful operation of Defendant's scheme.

### The FXCM Fraud Enterprise

56.     Section 1961(4) of RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

57.     The following persons, and others presently unknown, have been members of and constitute an "enterprise" within the meaning of RICO, which are referred to herein collectively as the "FXCM Fraud Enterprise:"

    a. The Defendant, FXCM, Inc.;

    b. The middleware/software companies, and individual programmers, that assisted FXCM in the development of its client side trading platform and in the development of modifications to its backend software used to communicate with client side trading platforms that allow Defendant to employ various unscrupulous activities as described herein; and

    c. Introducing brokers, who also participate in the capacity of educational firms that offer books, audio programs, seminars, coaching and software to help consumers profit in Forex trading, to whom Defendant paid commissions.

58.     The "FXCM Fraud Enterprise" is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of employing the multiple deceptive, abusive and fraudulent acts described herein.   The FXCM Fraud Enterprise is an ongoing organization with an

ascertainable structure, and a framework for making and carrying out decisions, that functions as a continuing unit with established duties, and that is separate and distinct from the pattern of racketeering activity in which Defendant has engaged and is engaging. The FXCM Fraud Enterprise was used as a tool to effectuate the pattern of racketeering activity.

59.   Specifically, Defendant, as the leader of the FXCM Fraud Enterprise, has worked with independent middleware/software companies, including, but not limited to, Boston Technologies, and with various individual programmers, some who are employees of Defendant, and others who are not, to create and deploy automated computerized algorithms in Defendant's back-end software that allow Defendant to implement various dishonest trade execution practices described in this Complaint. Defendant, the middleware/software companies, and the individual programmers, have worked together to design, customize, and employ, specialized software applications in Defendant's trading platform which allow Defendant to dishonestly manipulate settings in Defendant's trading platform to the detriment of Defendant's customers. Through this relationship between Defendant and the middleware/software companies, and individual programmers, Defendant has been able to deliberately and willfully employ dishonest trade execution practices including slippage, re-quotes, and server delays, all for the purpose of gaining profits at the expense of its customers, turning its customer's profitable trades into less profitable trades or complete losses.  This conduct is in furtherance of the goals of the FXCM Fraud Enterprise and continues to this day as Defendant and the middleware/software companies, and individual programmers,

periodically maintain and upgrade the specialized software applications that they have designed for use in Defendant's trading platform.

60.    In addition, in furtherance of the goals of the FXCM Fraud Enterprise, Defendant provides financial incentives to the middleware/software companies, and individual software programmers, involved in the FXCM Fraud Enterprise to steer customers to Defendant's rigged trading platform.   These middleware/software companies, and individual software programmers, are aware that the Defendant utilizes the dishonest trade execution practices they have embedded into Defendant's trading platform, but nonetheless attempt to influence individuals to use Defendant's services in an effort to share in the fruits of the FXCM Fraud Enterprise.

61.    At the bottom of the hierarchy of the FXCM Fraud Enterprise lie the independent third-party "Introducing Brokers."   Defendant uses the services of Introducing Brokers, who are paid commissions or fees, to steer customers to Defendant's rigged trading platform in furthering the ends of the FXCM Fraud Enterprise.   In most instances, the Introducing Brokers are not aware of Defendant's dishonest trade execution practices, but nevertheless, these Introducing Brokers assist in the perpetuation of the goals of the FXCM Fraud Enterprise by bringing additional customers to Defendant.   These Introducing Brokers also assist in perpetuating the goals of the FXCM Fraud Enterprise by predictability passing on and repeating the various fraudulent statements of Defendant, albeit in many instances unwittingly, but nonetheless bolstering the believability of the Defendant's false statements.

62.    The FXCM Fraud Enterprise is an ongoing enterprise that engages in, and whose activities affect, interstate commerce by, among other things, marketing,

advertising, selling, or providing a Forex trading platform to thousands, if not hundreds of thousands, of entities and individuals throughout the United States, as described herein. The FXCM Fraud Enterprise began by at least September 1999 and presently continues to operate as a single continuing unit.

63.     The overarching purpose of the FXCM Fraud Enterprise is for each of its members to profit from customers' opening Live Accounts with Defendant.  Defendant accomplishes this goal by defrauding and manipulating customers, stealing money from those customers, by accepting funds for foreign currency trading and misappropriating those funds, or the proceeds derived therefrom, through the dishonest trade execution practices described in this Complaint.  The middleware/software companies, and individual programmer, as members of the FXCM Fraud Enterprise, accomplish this goal by creating software systems necessary to enable and empower Defendant to engage in the dishonest trade execution practices described in this Complaint, and then sharing in the illicit profits gained thereby.  The Introducing Brokers further this goal by recommending that customers use Defendant's services (and trading platform) in exchange for compensation.

**B.     Predicate Acts (Mail and Wire Fraud)**

64.     Section 1961(1) of RICO provides that "racketeering activity" is, among other things, any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud).

65.     As set forth below, to carry out, or attempt to carry out its scheme to defraud, Defendant has engaged in, and continues to engage in, the affairs of the FXCM

Fraud Enterprise through the following pattern of racketeering activity, in violation of 18 U.S.C. § 1341 (mail fraud) and §1343 (wire fraud):

 a. Defendant, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, matters and things relating to its uniform deceptive national advertising and marketing campaign, including the following widespread advertising programs, promotions and press releases:

  i. Prior to its annual Expo in 2006, FXCM initiated a "big advertising offensive," with the objective of "reach[ing] everyone who [wa]s considering currency trading to come to th[e] Expo and receive an excellent education in Forex at no expense." This "big advertising offensive" included *[M]ail[ing] 160,000* specially designed currency magazines and distribut[ing] another 300,000 as inserts in Financial Times and Investor's Business Daily… *[T]wo direct mail drops of 100,000 each*, and two email campaigns of over 300,000 each, supplemented by a continuing campaign on 20 major internet sites"[1]; these materials did not disclose to potential customers that Defendant subjects Live Accounts to the dishonest trade execution practices alleged in this Complaint or that

---

[1] http://www.prnewswire.com/news-releases/fxcm-currency-expo-response-much-bigger-than-expected-56059962.html.

Defendant provides a different level of service to Demo Accounts than Live Accounts;

ii. Upon information and belief, on or around June 11, 2008, Defendant publicly announced RSS feeds would be included in e-mail newsletters, which Ross Soodosingh, FXCM's e-mail marketing manager at the time, noted was "part of an integrated marketing plan which also include[d] online banner ads, a sales team and *direct mail campaigns* inviting prospects to sign up for a demo where they can trade using play money;[2] these materials did not disclose to potential customers that Defendant subjects Live Accounts to the dishonest trade execution practices alleged in this Complaint or that Defendant provides a different level of service to Demo Accounts than Live Accounts; and,

iii. FXCM also hosted a Forex trading expo in Las Vegas from May 3–4, 2010, which included dozens of educational courses for all levels of trader experience. Central to that expo experience was a course track designed specifically for MT4* traders, covering a variety of specialty topics, including, among other things, a "No Dealing Desk vs. Dealing Desk Q&A with FXCM's CEO, Drew Niv," seminars on "Learn[ing] How to Develop a Trading Plan" and "DailyFX Tips and Trading Strategies," along with "Dozens of MetaTrader 4 Workshops."[3] Upon information and belief, similar to its marketing plan for the 2006 expo, FXCM marketed

---

[2] http://chiefmarketer.com/disciplines/online/0611-rss-helps-boost-clickthroughs/.
[3] http://www.mataf.net/forums/fxcm-ForexForex-Trading-Expo-t13245.html

this expo through direct mailings with the United States Post Office; these mailings did not disclose to potential customers that Defendant subjects Live Accounts to the dishonest trade execution practices alleged in this Complaint or that Defendant provides a different level of service to Demo Accounts than Live Accounts.

b. Further, Defendant, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by Postal Service, caused matter and things to be delivered by commercial interstate carrier, and received matter and things from the Postal Service or commercial interstate carriers, including, but not limited to, requiring its customers to mail Client Agreements to its home office at 32 Old Slip, 10th Floor New York, NY 10005 United States. As described herein, these client agreements included the following false information, which Defendant included in its client agreements to perpetuate its scheme to defraud its customers:

   i. In its October 17, 2008, June 16, 2009, February 28, 2010 and June 10, 2010 Client Agreements, Defendant included a risk disclosure statement outlining, among other things, that: (a) "Forex transactions carry a high degree of risk"; (b) "[m]arket conditions (*e.g.*, liquidity) and/or the operation of the rules of certain markets (*e.g.*, the suspension of trading in any foreign currency because of price limits or "circuit breakers") may increase the risk of loss by making it difficult or impossible to effect transactions or liquidate/offset

27

positions"; (c) "[t]he profit or loss in transactions in foreign currency (whether they are traded in your own or another jurisdiction) will be affected by fluctuations in currency rates where there is a need to convert from the currency denomination of the foreign currency position to another currency"; and (d) "[m]ost electronic trading facilities are supported by computer-based component systems for the order-routing, execution, matching, registration or clearing of trades. As with all facilities and systems, they are vulnerable to temporary disruption or failure. Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms. Such limits may vary…," and (e) "that [t]rading on an electronic trading system may differ not only from trading in an open-outcry market but also from trading on other electronic trading systems. If you undertake transactions on an electronic trading system, you will be exposed to risks associated with the system including the failure of hardware and software. The result of any system failure may be that your order is either not executed according to your instructions or is not executed at all . . . ."

ii. Similarly, in its August 22, 2007 Client Agreement, Defendant included the same risk disclosures outlined above, with a slight difference in (d), which noted that "[m]ost open-outcry and electronic trading facilities are supported by computer-based component systems

28

for the order-routing, execution, matching, registration or clearing of trades.   As will all facilities and systems, they are vulnerable to temporary disruption or failure.   Your ability to recover certain losses may be subject to limits on liability imposed by the system provider, the market, the clearing house and/or member firms.   Such limits may vary."

iii.   None of the above Client Agreements expressed the actual risks attendant with trading on Defendant's trading platform given that Defendant subjected Live Accounts to the deceptive trade execution practices alleged in this Complaint.

c.   Defendant, in violation of 18 U.S.C. § 1343, transmitted and received by wire, internet connection, or other electronic media, matters and things relating to its uniform deceptive national advertising and marketing campaign, including the following widespread advertising programs, promotions, seminars, press releases, "consumer-oriented" statements, and advertising within its website, including the Demo Account described herein:

i.   Upon information and belief, Plaintiff alleges that from at least January 2007 through present, on its website, Defendant has consistently touted itself as abiding by a *Code of Conduct*, including, but not limited to, the following:

FXCM… is committed to maintaining the highest level of public trust and confidence. As an industry leader and one of the world's largest non-bank Futures Commission Merchants specializing solely in spot Forex transactions… we have earned a reputation for fairness, honesty, and integrity, and consider this to be our most

29

valuable corporate asset. We recognize that our reputation hinges on the adherence of our employees to the highest standards of ethical behavior and professionalism in the performance of their duties, without which our history of accomplishments would not have been possible.

\* \* \*

The Code is designed to promote the values and principles it embodies and to deter any wrongdoing. The Code is crucial in ensuring that our employees—as well as the public at large—are aware of the standards we have set for ourselves…

\* \* \*

FXCM's objective is to provide our clients with the utmost in value and client service and to maximize their Forex trading experience. Notwithstanding these objectives, the Company places legal and regulatory compliance above profits…

FXCM realizes that our success is based on the Company's reputation for integrity along with the public trust and confidence this reputation has garnered. We respect the interests of our clients, honor our commitments, and are forthright in promising only what we can deliver.

A general requirement of any NFA Member is that communications with the public may not be deceptive or misleading. FXCM believes that the imperative for truthfulness does not stem merely from the strictures of regulatory compliance; rather, it is due to our philosophy of increased investor protection that we undertake every effort to ensure that our client communications and promotional materials are truthful and complete. Accurate and complete information enables investors to make intelligent decisions and, therefore, our statements are designed not to confuse or mislead…

We compete aggressively in furtherance of our overall interests, yet we do so fairly, ethically, and in a manner that fully complies with all applicable laws and regulations, as well as the values and principles embodied in this Code.

Our history of success has been achieved through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. We endeavor to deal fairly with our clients, service providers, other firms, and individual colleagues. We

30

oppose taking unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair practice.

FXCM has a history of living up to the commitments and responsibilities we have toward our clients... To our clients, we are committed to providing our products and services in an efficient and innovative manner consistent with their needs, and we offer a trading environment that is fast, reliable, convenient, and valuable in terms of price and quality…

Reliability is the hallmark of FXCM and the products and services we offer… Our goal is to give clients peace of mind in the knowledge that they can depend on us, thereby freeing them to dedicate more attention to their individual investment strategies…

FXCM acknowledges the importance of all relevant laws, rules, regulations, policies and standards – whether internal or external— and complies with them. We are committed to strict management discipline and a first-class control and compliance environment…

It is FXCM's policy that the information in our communications be full, fair, accurate, timely, and understandable… All employees involved in our disclosure process… are required to maintain familiarity with applicable disclosure requirements, and they are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts to others, whether within or outside the Company, including our independent auditors.

FXCM strives to maintain an open and transparent dialogue with our clients and others, based on fairness, mutual respect, and professionalism.

We expect our employees to act at all times in good faith, with due care, competence, credibility and diligence, and without any misrepresentation of material facts.[4]

ii.  Upon information and belief, Plaintiff alleges that on or about

April 16, 2008, on its website, Defendant advertised its "Execution

Advantage" and reasons for trading with FXCM by noting that

---

[4] As of January 17, 2011, Defendant's Code of Conduct can be found at http://www.fxcm.com/code-of-conduct.jsp.

"FXCM's No Dealing Desk aims to provide transparent and fair execution," with "no conflict of interest between broker and trader," and "No dealer intervention in trades," also including that "price providers (Banks) do not see your stops, limits, and entry orders," and "competition reduces the potential for market manipulation by price providers."[5]

iii.  Upon information and belief, on or about October 27, 2009, Defendant advertised "The Truth About Forex Trading Guide," in PDF form on its website, which included, in relevant part, the following information regarding the benefits of No Dealing Desk execution:

> FXCM makes an identical amount of money in the form of pip markups (which are really commissions) regardless of whether the customer made or lost money on the account… When a customer clicks on a price, they are actually clicking on a price from the bank that currently has the best bid or offer, plus our markup… We don't benefit from customer losses.

When discussing how traditional dealing desks make money, FXCM noted there are two ways dealers make money, including:

> (1) "taking the other side of the order," which causes the customer to "clos[e] the position at a loss but at a profit to the dealer.  Obviously if the opposite occurred the dealer would lose. If dealer losses persist over more than a few trades, dealers will manually intervene and begin to either widen the spread and/or re-quote the order," and (2) …customers, no matter if they are buying currencies, stocks, etc., tend to buy falling markets and sell risking markets, generally allowing the dealer to wait and get a better price.  Customers who have prices move in their favor quickly, after getting filled, are unprofitable for the Forex dealer,

---

[5] http://web.archive.org/web/20080416212844/www.fxcm.com/execution-advantage.jsp

and between re-quotes, spread widening, etc., these types of strategies are discouraged by dealers."

When discussing its ideal customers, FXCM noted that it:

[E]ncourages profitable clients to sign up since we depend on size and trade frequency to make money.  Our assumption is that the more profitable traders eventually trade bigger and more often.  Many dealing desks have problems with profitable clients because many strategies that are profitable are impossible or not that easy to hedge as a dealer.  As a rule, unregulated dealers in offshore jurisdictions will rarely tolerate any real streak of profitability and some have been known to be very creative in their attempts to restrain profitable clients.  Regulated onshore brokers, as a general rule of thumb, do not engage in market manipulation and other things where the regulatory penalties would be severe.  Nevertheless, some trading desks might not have the customer's best interest at heart and might ensure that the trading desks are protected and profitable.

When discussing how to distinguish between a broker with Dealing Desk execution and one with No Dealing Desk execution, FXCM noted:

A broker offering No Dealing Desk execution will not have order restrictions, will not re-quote trades, and will not restrict trading strategies.  The role of a No Dealing Desk broker is to act as a true middle man that offers access to the market and who collects a transaction fee for doing so.

iv.  Upon information and belief, Plaintiff alleges that on or about October 27, 2009, Defendant advertised a trading guide, in the form of side-by-side videos regarding the differences between "No Dealing Desk (FXCM)" and "Dealing Desks (most of the other guys)," which included, in relevant part, the following information:

**No Dealing Desk (FXCM) Video**

Our Best Bid/Offer Engine (BBOE), selects the best Buy price and the best Sell price, creating the best spread available. Next, FXCM automatically adds a markup to either side, typically about 1 pip on major currency pairs. This markup is how FXCM makes money. The best spread plus markup is shown to our clients on their trading screens as tradable price.

[The client's] order is sent through FXCM's Straight-Through-processing system and an exact matching order is sent from FXCM to the bank with the best Buy price. To the bank, all orders appear as Market Orders from FXCM and contain no information about the trader.

No matter how much profit or loss [the client] makes on [the] trade, FXCM earns the same amount of money – that markup. The entire process is fast, automated, and fair.

**Dealing Desks (most of the other guys) Video**

Unlike FXCM's automated straight-through Forex processing system, [the dealer] merely watches the bank prices...[and] decides what price his client's will see. Depending on [the dealer's] needs and market conditions, he can create his own indicative price to display to the trader.

If the market is moving quickly, [the dealer] might not be able to find a profitable match for [the client's] sell order before the bank prices move. Since [the dealer's] job is to make money, he is not going to take [the client's trade] at a loss. So, [the dealer] issues a re-quote – rejecting the original order and giving [the client] a new, worse price that he can either accept or reject. In fast markets, this can happen multiple times and Steve can be re-quoted again and again and again. This can ruin [the client's] exit, costing him profits or increasing his loss.

Although [the dealer] can make a nice profit from wheeling and dealing between banks and [the client], he can make even more money by simply taking the other side of [the client's] trade, cutting out the banks completely… In this scenario, [the dealer] and the dealing desk can lose money when [the client] makes money. [The broker] can also make money when [the client] loses. And the bigger [the client's] loss, the bigger [the dealer's] profit becomes. That's good for the [dealer] and the Dealing Desk, but pretty bad

34

for [the client]. This is why FXCM created its no dealing desk Forex execution system, which eliminates this inherent conflict of interest between the dealing desk and the trader.[6]

v.  Moreover, upon information and belief, Plaintiff alleges that on or about at least January 17, 2011, Defendant noted on its website the following:

> FXCM does not take a market position—eliminating a major conflict of interest. A dealing desk broker, which acts as a market maker, may be trading against your position. However, with our No Dealing Desk execution, we fill your orders from the best prices available to us from the banks. While an individual bank may try to skew its prices off the market, the unattractive price on the bid or ask side will lose the price competition and as a result, not factor into the prices streamed to you. At FXCM, prices are not subject to manipulation by a broker or a banks dealing desk.[7]

vi.  All of the above statements are false in that they do not disclose the actual risks attendant with trading on Defendant's trading platform given that Defendant subjects Live Accounts to the deceptive trade execution practices alleged in this Complaint.

d.  Defendant, in violation of 18 U.S.C. § 1343, conducted exchanges, payments, and monetary transfers using the wires concerning the receipt and distribution of the proceeds of Defendant's improper marketing scheme.

66.    Defendant's misrepresentations and acts were knowing and intentional, and made with the intent to create and manage its scheme to defraud and manipulate

---

[6]  http://web.archive.org/web/20110117182753/http://www.fxcm.com/fxcm-ForexForex-execution.html

[7]  As of January 17, 2011, this information can be found at http://www.fxcm.com/ForexForex-trading-benefits.jsp.

customers by accepting funds for foreign currency trading and misappropriating or manipulating the amounts traded, as described in the Complaint.

67.    Plaintiff and Class Members reasonably relied on Defendant's false statements by continuing to invest money with Defendant and not taking immediate action to close their accounts and demand the return of their investments.

68.    As described below, Defendant's violations of these statutes constitute a "pattern of racketeering activity" because such predicate acts were related to each other in that they were committed as part of an illegal and fraudulent marketing scheme, and an illegal and fraudulent scheme to defraud and steal money from customers by accepting investments for foreign currency futures trading and misappropriating or manipulating the amounts invested, all of which amount to or pose a threat of continued criminal activity.

69.    As a direct and proximate result of Defendant's illegal conduct in violation of 18 U.S.C. § 1962(c), Plaintiff and Members of the Class have been injured in their business or property by the following acts, which include, but are not limited to:

      a. The theft and loss of the amounts Plaintiff and the Class invested with Defendant in an amount that will be proven at trial; and

      b. The consequential damages relating to not receiving the investment return that Plaintiff and the Class could have obtained from prudent investments in an amount that will be proven at trial.

Complaint and Demand for Jury Trial

### C.      The Pattern of Racketeering Activity

70.     As set forth herein, Defendant has engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past 10 years.

71.     Defendant has engaged in a scheme to defraud consumers, including Plaintiff and Class Members, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact in their Client Agreements, marketing materials, on their website, and in other advertisements, with the use of United States mail or interstate telecommunication systems for the purpose of executing its scheme.

72.     Defendant's scheme to defraud was knowingly made and reasonably calculated with the intent to deceive and defraud persons of ordinary prudence and comprehension, including Plaintiff and Class Members.

73.     Defendant's scheme to defraud was made with intent to induce reliance by Plaintiff and Class Members upon such misrepresentations, concealments, suppressions, or omissions.

74.     Defendant's scheme to defraud was made with the purpose of gaining hundreds of millions, and potentially billions, of dollars in profits from customers, including Plaintiff and Class Members, that would not have been gained but for Defendant's acts and omissions alleged herein.

75.     As detailed below, Defendant's fraudulent scheme and conspiracy consisted of, among other things:

Complaint and Demand for Jury Trial

a. The unlawful promotion and marketing of software designed by Defendant and the middleware/software companies, and individual programmers it retained, that allows or makes possible the dishonest trade execution practices on Defendant's trading platform, as described in this Complaint;

b. The unlawful promoting and marketing of materials and advertisements containing false information, including, but not limited to, the Demo Account described in this Complaint, upon which Defendant used to manipulate and induce reliance on customers, thereby engaging in unethical and illegal behavior to gain profits from its customers;

c. Embarking on an aggressive sales and marketing campaign, through television, internet, seminars, the Demo Account described in this Complaint, and other advertising media, through which Defendant misrepresented that an average person, without any particular training or expertise, could experience and enjoy substantial profit and financial gain by trading foreign currencies using Defendant's software when, in actuality, unlike Live Accounts, the Demo Accounts are not subjected to intervention and market manipulation by the Defendant, and Live Accounts are subjected to the dishonest trade execution practices described in this Complaint;

d. Embarking on an aggressive sales and marketing campaign, through television, internet, seminars, and promotion of the Demo Account described in the Complaint, and other advertising media, for the purpose

of inducing new and existing customers to actively trade foreign currencies on Defendant's deceptive trading platform so Defendant could employ the dishonest trade execution practices described in the Complaint;

e. Deliberately misrepresenting, and causing others to misrepresent, or concealing, and causing others to conceal, that unlike Live Accounts, the Demo Account described herein was not subjected to intervention and market manipulation by the FDM/FCM; and

f. Deliberately misrepresenting, and causing others to misrepresent, or concealing, and causing others to conceal, the following deceptive acts relating to the trading software employed by Defendant, through its website, to adversely affect consumer trades on the Forex trading platform:

    i. Routing a customer's account to a "slow server" causing trade execution to be systematically slowed down, and allowing Defendant the time to hijack any potential profit in the trade, by buying and selling in-between the customer's order and the real market, with Defendant taking any profit, and leaving the customer victimized;

    ii. Preventing the customer from closing out a profitable trade, as a result of Defendant and its agents sending a series of "error" messages to the customer, thereby blocking the customer's efforts

to finalize a profitable order benefiting Defendant to the detriment of the customer;

iii. Preventing the customer from closing out a profitable trade, as a result of Defendant's abusive price slippage practices, benefiting Defendant to the detriment of the customer;

iv. Manipulating the market price of the traded currency, including printing bogus "flash trades" that move the "market" to the customer's stop order for a given trade, essentially wiping the customer out for that trade, benefiting Defendant to the detriment of the customer;

v. Preventing the customer from making a profit, and failing to execute valid and profitable trade orders entered by the customer, benefiting Defendant to the detriment of the customer;

vi. Causing the customer to receive a "slow fill" or "no fill," response as the customer attempts to close out a profitable trade, benefiting Defendant to the detriment of the customer; and

vii. Arbitrarily changing the margin rules without any notice to the customer, which deprives customers of any trading advantages or leverage opportunities that they may have had, benefiting Defendant to the detriment of the customer.

76. The above-described racketeering activities amount to a common course of conduct intended to deceive and harm Plaintiff and Members of the Class. Each such racketeering activity is related, has a similar purpose, involves the same or similar

participants and methods of commission, and has similar results affecting similar victims, including Plaintiff and Members of the Class.  These acts pose a threat of continued racketeering activity and constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

77.    Many of the precise dates and times of Defendant's violations of the above-referenced statutes are not known. Indeed, an essential part of the successful operation of the illegal sales and marketing scheme alleged herein depended upon secrecy and Defendant took deliberate steps to conceal its wrongdoing.  However, given the massive scope of the illegal and fraudulent scheme, Defendant likely committed thousands, if not millions, of predicate acts of "racketeering activity."

78.    Defendant's violations of the above laws, and the effects thereof detailed above, are continuing and will continue. Plaintiff and Members of the Class are and continue to be injured in their property by reason of these violations in that Plaintiff and Members of the Class have traded, and continue to trade, on Defendant's Forex trading platform, which trades would not have been made had Defendant not conspired to violate 18 U.S.C. § 1962(c).

79.    Plaintiff's and Class Members' injuries are directly and proximately caused by Defendant's racketeering activity as described herein.

80.    Plaintiff and Members of the Class have standing to sue Defendant under 18 U.S.C. § 1964(c) and to recover compensatory damages, treble damages, and the costs of suit, including reasonable attorneys' fees.

81.     In addition, Plaintiff and Class Members are entitled to declaratory and injunctive relief, pursuant to 18 U.S.C. § 1964(a), to remedy and prevent Defendant from engaging in further violations of Federal law.

82.     Upon information and belief, there have been numerous other predicate acts by Defendant that are presently unknown to Plaintiff and Members of the Class.

**COUNT II**
**VIOLATION OF NEW YORK GENERAL BUSINESS LAW 349(h)**

83.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

84.     As described herein, Defendant has engaged in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiff and Class Members.

85.     Defendant has concealed, continues to knowingly conceal, and caused others to conceal, and has knowingly misrepresented, and caused others to misrepresent, information about its market and account manipulation during Live Trading.

86.     Defendant's deceptive acts and practices are of a recurring nature directed at consumers.

87.     Defendant's deceptive acts and practices have a broad, uniform impact on consumers at large.

88.     Defendant's deceptive acts and practices are materially deceptive and misleading.

89.     Plaintiff and Members of the Class have been injured, and are continuing to be injured, as a direct and proximate result of Defendant's deceptive acts and practices.

Complaint and Demand for Jury Trial

## COUNT III
## VIOLATION OF NEW YORK GENERAL BUSINESS LAW 350

90.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

91.     As described herein, Defendant has engaged, and continues to engage, in unfair or deceptive acts or practices in the conduct of business, trade or commerce, or in the furnishing of services, that resulted in injury to Plaintiff and Class Members.

92.     Defendant has engaged, and continues to engage, in the above-described uniform deceptive national advertising and marketing program, including widespread advertising campaigns, promotions, seminars, press releases, "consumer-oriented" statements and advertising within its website, including by use of the Demo Account described herein.

93.     Plaintiff and Class Members reasonably relied, and continue to reasonably rely, upon the skill and judgment of Defendant, its agents, servants, and employees, and the representations and claims made by Defendant in its uniform deceptive national advertising and marketing campaigns and its representations made during live trading.

94.     Defendant's deceptive acts and practices are of a recurring nature and are directed at consumers.

95.     Defendant's deceptive acts and practices have a broad, uniform impact on consumers at large.

96.     Defendant's deceptive acts and practices are materially deceptive and misleading.

97.     Plaintiff and Members of the Class have been, and continue to be, injured as a direct and proximate result of Defendant's deceptive acts, practices and advertisements.

## COUNT IV
## BREACH OF CONTRACT

98.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

99.     Defendant entered into agreements with Plaintiff and Class Members to trade on Defendant's Forex trading platform.

100.    Plaintiff and Class Members have fully performed all of their obligations under the respective agreements, except to the extent that such performance has been excused, prevented, hindered, frustrated and/or rendered useless by the acts and omissions of Defendant.

101.    As described below, Defendant has failed to fully perform its obligations under the respective Client Agreements.

102.    In the relevant Client Agreements, Defendant notes that it strictly forbids any form of manipulation of its prices, execution and trading platforms.  Through its deceptive and manipulative trading practices described herein, including intentional manipulation of prices, execution and trading platforms, Defendant has failed to fully perform this obligation under the contract.

103.    In the relevant Client Agreements, Defendant notes that, while it may act as a counterparty to the customer's trades, each trade is made under a "No Dealing Desk" model and Defendant does not profit when a customer loses money on a trade; rather,

Defendant profits by simply marking up the price it receives from the bank.  Through its deceptive and manipulative trading practices described herein, including the undisclosed failure to implement a "No Dealing Desk" model, and the manipulation of prices, and the manner of trade executions on its trading platforms, Defendant has failed to fully perform this obligation under the contract.

104.    In the relevant Client Agreements, Defendant notes that trade orders and trade details are generated by MetaTrader 4 and not by Defendant and that Defendant's responsibility is to use commercially reasonable efforts to enter orders pursuant to the trade orders and trade details generated by MetaTrader 4 and as received by Defendant. Through its deceptive and manipulative trading practices described herein, including intentional manipulation of its trading platform, Defendant has failed to fully perform this obligation under the contract.

105.    Defendant has breached the above respective Client Agreements as a result of its deceptive, fraudulent and manipulative business practices described herein.

106.    As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

## COUNT V
## BREACH OF IMPLIED COVENANT OF
## GOOD FAITH AND FAIR DEALING

107.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

108.    A covenant of good faith and fair dealing in the course of contract performance is implicit in all contracts.

45

109.    The purpose of the implied covenant of good faith is to further an agreement by protecting the promisee against a breach of the reasonable expectations and inferences otherwise derived from the agreement.

110.    The covenant of good faith and fair dealing protects the bargained-for terms of the agreement.

111.    During the Class Period, Defendant entered into a contract with Plaintiff and Members of the Class relating to trading on Defendant's Forex trading platform.

112.    The bargained for terms of the subject agreements included an agreement made by Defendant to engage in good faith practices on its trading platform and to present a reliable trading platform where consumers can execute trades, free of manipulation and deception by Defendant.

113.    In contravention of these bargained for terms, Defendant engaged in various unscrupulous acts with a purpose of defrauding its customers by accepting funding for foreign currency trading and misappropriating or manipulating the amounts invested, while hiding behind auspices of a "disclaimer" buried inside lengthy, incomprehensive computer generated Client Agreements.

114.    By reason of Defendant's above-described conduct, Defendant has breached the covenant of good faith and fair dealing causing Plaintiff and Class Members substantial harm.

115.    Plaintiff and Class Members have fully performed all of their obligations under the agreement, except to the extent that such performance has been excused, prevented, hindered, frustrated and/or rendered useless by the acts and omissions of Defendant.

116. As described above, Defendant has failed to perform its obligations under the contract as a result of its deceptive, fraudulent and manipulative business practices described herein.

117. As a direct and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class Members have suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, William H. Sanders, on behalf of himself and all others similarly situated, prays for judgment and relief on all Counts against Defendant, FXCM, as follows:

A. That an Order be entered certifying that the action may be maintained as a class action;

B. That temporary or preliminary injunctive relief be granted, pending final adjudication and the ordering of permanent relief;

a. Enjoining FXCM from pursuing the policies, acts, and practices complained of herein; and

b. Providing restitution to all customers who were subjected to FXCM's wrongdoing;

C. That permanent injunctive relief be granted enjoining FXCM from pursuing the policies, acts, and practices complained of herein and ordering restitution to customers;

D. That judgment be entered against FXCM for compensatory damages, including treble damages for Civil RICO as provided by 18 U.S.C. § 1964 (c);

47

Complaint and Demand for Jury Trial

E.  That reasonable attorney's fees be awarded;

F.  That costs of this litigation be awarded; and

G.  That such other and further relief as the Court may deem necessary or appropriate be ordered.


MORGAN & MORGAN, P.A.
Business Trial Group

By: _____
    Tucker H. Byrd, Esq. (Lead Trial Counsel)
    Florida Bar No. 381632
    *Pending Pro Hac Vice Application*
    Telephone: 407-244-9494
    Facsimile: 407-418-2048
    Email: TByrd@BusinessTrialGroup.com

    James S. Byrd, Jr., Esq.
    Florida Bar No. 539104
    *Pending Pro Hac Vice Application*
    Orlando, FL 32801
    Email: JByrd@BusinessTrialGroup.com


MORGAN & MORGAN, P.A.
Business Trial Group

By: _____
    J. Carlos Real, Esq.
    New York Reg. No. 4147310
    20 N. Orange Avenue, Suite 1600
    Orlando, FL 32801
    Email: Creal@BusinessTrialGroup.com

    Scott Wm. Weinstein, Esq.
    Florida Bar No. 563080
    12800 University Drive, Suite 600
    Fort Myers, FL 33907-5337
    Email: sweinstein@forthepeople.com

    J. Andrew Meyer, Esq.
    Florida Bar No. 56766
    One Tampa City Center
    201 N. Franklin Street
    Tampa, FL 33602
    ameyer@forthepeople.com


Dated: February 8, 2011