UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM H. SANDERS, on behalf of<br>Himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FOREX CAPITAL MARKETS, LLC,<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**CASE NO.:** 1:11-cv-00864-CM

ECF CASE

**PLAINTIFF WILLIAM H. SANDERS' RESPONSE MEMORANDUM IN OPPOSITION
TO DEFENDANT FOREX CAPITAL MARKETS, LLC'S MOTION
TO COMPEL ARBITRATION OF PLAINTIFF'S
<u>INDIVIDUAL CLAIMS AND TO STAY PROCEEDINGS</u>**

**MORGAN & MORGAN, P.A.**
**Business Trial Group**
20 N. Orange Avenue, Suite 1600
Orlando, FL  32801

*Attorneys for Plaintiff William H. Sanders*

**TABLE OF CONTENTS**

**Page**

Table of Contents……………………………………………………… i
Table of Authorities…………………………………………………… ii
Response…………………………………………………...........1
I.      THE ARBITRATION CLAUSE DEFENDANT SEEKS TO ENFORCE
        IS INVALID BECAUSE IT DOES NOT COMPLY WITH FEDERAL
        LAW GOVERNING RETAIL FOREX TRADING
        CONTRACTS…………………………………………………1
        a.   Recent Amendments to the Commodities Exchange Act and the CFTC
             Implementing Regulations Confirm that the Client Agreements at
             Issue in the Present Case Are Governed by the Dispute Resolution
             Procedures Contained in 17 CFR s.
             166.5………………………………………………………..2
        b.   Neither of the Arbitration Clauses at Issue in the Present Case Comply
             with the CFTC Dispute Resolution Procedures and Are Therefore
             Unenforceable………………………………………………8
II.     THE ARBITRATION CLAUSE DEFENDANT SEEKS TO ENFORCE
        IS INVALID BECAUSE IT IS BOTH PROCEDURALLY AND
        SUBSTANTIVELY
        UNCONSCIONABLE…………………………………………...10
        a.   The Method by Which FXCM Obtained Plaintiff's "Consent" for and
             Purportedly Modified the Parties' Arbitration Clause to That
             Contained in the 2005 Client Agreement is Procedurally
             Unconscionable………………………………………………13
        b.   The Arbitration Clause FXCM Seeks to Enforce is Substantively
             Unconscionable………………………………………………17
III.    BEFORE THE COURT MANDATES ARBITRATION UNDER THE
        CLAUSE FXCM SEEKS TO ENFORCE, THE COURT SHOULD
        PROVIDE PLAINTIFF WITH AN OPPORUTNITY TO TAKE
        LIMITED DISCOVERY CONCERNING THE UNCONSCIONABILITY
        OF THE ARBITRATION CLAUSE……………………………..20
IV.     CONCLUSION………………………………………………...24

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   567 F.2d. 1175 (2d Cir. 1977)..................................................................2, 10

*Bell v. Cendant Corp.,*
   293 F.3d 563 (2d Cir. 1993)..........................................................................11

*Board of Educ. v. CNA Ins. Co.,*
   839 F.2d 14, 18 (2d Cir.1988).......................................................................16

*Brennan v. Bally Total Fitness,*
   153 F.Supp.2d 408 (S.D.N.Y. 2001)..................................................12, 16, 20

*Brooks v. Robert Larson Automotive Group, Inc.,*
   2009 WL 2853452 (W.D. Wash. Sept. 1, 2009)............................................6

*Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,*
   346 F.3d 360 (2d Cir.2003)..........................................................................11

*CFTC v. Erskine,*
   512 F.3d 309 (6th Cir. 2008)..........................................................................4

*Commodities Futures Trading Commission v. Zelener,*
   373 F.3d 861 (7th Cir. 2004)..............................................................3, 4, 5, 6, 7

*David v. Merrill Lynch, Pierce, Fenner and Smith,*
   440 N.W.2d 269 (N.D. 1989)........................................................................10

*Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,*
   191 F.3d 198 (2d Cir.1999)............................................................................7

*Diarassouba v. Urban,*
   892 N.Y.S. 2d 410 (N.Y. 2009).....................................................................21

*Doctor's Assocs., Inc. v. Casarotto,*
   517 U.S. 681 (1996)......................................................................................11

*Fensterstock v. Education Finance Partners,*
   618 F.Supp.2d 276 (S.D.N.Y. 2009)........................................................11, 18

*First Options of Chicago, Inc. v. Kaplan,*
   514 U.S. 938 (1995)......................................................................................11

*Genesco, Inc. v. T. Kakiuchi & Co.,*
 815 F.2d 840 (2d Cir. 1987)................................................................10

*Gillman v. Chase Manhattan Bank, N.A.,*
 534 N.E.2d 824 (1988)..................................................................12

*Gilmer v. Interstate/Johnson Lane Corp.,*
 500 U.S. 20 (1991).......................................................................7

*Hayes v. County Bank,*
 728 N.Y.S.2d 709 (2d Dep't 2001)....................................................20

*Honigsbaum's, Inc. v. Stuyvesant Plaza, Inc.,*
 577 N.Y.S.2d 165 (3rd Dep't 1991)...................................................16

*In re American Express Merchants' Litigation,*
 2011 WL 781698 (2d Cir. 2011).......................................................18

*Kristian v. Comcast Corp.,*
 446 F.3d 25 (1st Cir. 2006)............................................................19

*Kurz v. Chase Manhattan Bank USA, N.A.,*
 319 F.Supp.2d 457 (S.D.N.Y. 2004)..................................................10

*Landgraf v. USI Film Products,*
 511 U.S. 244 (1994)...................................................................6, 7

*Liang v. Huang,*
 679 N.Y.S.2d 210, 212 (3rd Dep't 1998)............................................16

*Markowitz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
 430 N.Y.S.2d 774 (N.Y.Sup. 1980)..................................................10

*Matter of Albrecht Chemical Co. (Anderson Trading corp.),*
 84 N.E.2d 625 (N.Y. 1949)............................................................21

*Nayal v. HIP Network Services IPA, Inc.,*
 620 F.Supp.2d 566 (S.D.N.Y. 2009)..................................................12

*Nichols v. Washington Mutual Bank, et. al.,*
 2007 WL 4198252 (E.D.N.Y. 2007)..................................................12

*Pezza v. Investors Capital Corp.,*
 2011 WL 767982 (D. Mass.)............................................................8

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989)...................................................................................................7

*Shearson Hayden Stone, Inc. v. Protzko*,
    296 N.W.2d 224 (Mich.App. 1980)..........................................................................10

*Specht v. Netscape Communications Corp.*,
    150 F.Supp.2d. 585 (S.D.N.Y. 2001).......................................................................11

*State v. Wolowitz*,
    96 A.D.2d 47, 468 N.Y.S.2d 131 (1983).............................................................12, 20

*Yesterdays Tree, Inc. v. National Grange Mutual Insurance Co.*,
2006 WL 1806467 (W.D.N.C. June 29, 2006)................................................................6


**Statutes and Regulations**

17 C.F.R. § 166.5................................................................................1, 2, 3, 5, 6, 7, 8, 9, 16

17 C.F.R. § 180.3............................................................................................2, 3, 4, 6, 7, 8

41 Fed.Reg. 27,526 (July 2, 1976)...........................................................................................2

41 Fed.Reg. 42,945 (Sept. 29, 1976)........................................................................................2

Pub. L. No. 111–203, Title VII (the Wall Street Transparency and Accountability
Act of 2010), § § 701–774, 124 Stat. 1376 (enacted July 21, 2010)..................................5


**Congressional Hearings**

*Hearing To Review Implications Of The CFTC v. Zelener Case, Subcommittee
On General Farm Commodities And Risk Management Of The Committee On
Agriculture House Of Representatives*, 111th Cong. (2009)..............................................4, 5

*Testimony Of Daniel J. Roth, President And Chief Executive Officer, National
Futures Association, and Testimony Of Terrence A. Duffy, Chairman Of Chicago
Mercantile Exchange Holdings, Inc., Senate Committee On Banking, Housing,
And Urban Affairs  U.S. Senate* (September 8, 2005).........................................................4

*Hearing To Review Implementation Of Changes To The Commodity Exchange Act
Contained In The 2008 Farm Bill*, 111th Cong. (2009).........................................................5

**RESPONSE IN OPPOSITION**

Plaintiff, William H. Sanders, on behalf of himself and all others similarly situated (hereinafter "Sanders"), hereby opposes the Motion to Compel Arbitration of Plaintiff's Individual Claims and to Stay Proceedings (the "Motion") filed by Defendant Forex Capital Markets, LLC ("FXCM"). Plaintiff opposes FXCM's Motion is premised on the basis that the arbitration clause FXCM seeks to enforce violates the procedural prerequisites of 17 C.F.R. § 166.5 and is unconscionable under New York law. Sanders further requests that before enforcing any arbitration agreement between the parties, the Court afford Sanders limited discovery to resolve a number of factual issues raised by FXCM's motion. Should the Court not deny FXCM's Motion outright, then Sanders requests that the Court extend the time for him to file his response for ninety (90) days during which time he should be permitted to engage in this limited discovery. Plaintiff submits the following Memorandum in Support of his opposition.

I.   **THE ARBITRATION CLAUSE DEFENDANT SEEKS TO ENFORCE IS INVALID BECAUSE IT DOES NOT COMPLY WITH FEDERAL LAW GOVERNING RETAIL FOREX TRADING CONTRACTS.**

The Complaint alleges that FXCM is "a registered Futures Commission Merchant ('FCM'), a registered Retail Foreign Exchange Dealer ('RFED'), and a Foreign Dealer Merchant ('FDM') as those terms are defined by the National Futures Association ('NFA')." Complaint at ¶ 13. FXCM does not take issue with this allegation in its motion to compel arbitration, and in fact, asks this Court to rule that any arbitration in this matter must be undertaken on an individual basis based upon the NFA's rules. FXCM conveniently ignores, however, a federal regulation governing FCMs, RFEDs and FDMs and retail forex trading contracts such as involved in this case that invalidates the arbitration clause FXCM seeks to enforce. This Court should deny FXCM's Motion because FXCM failed to follow the consumer protection rules promulgated by the Commodities Futures Trading

Commission ("CFTC") pursuant to the Commodities Exchange Act ("CEA") and found at 17 C.F.R. § 166.5.

**A.    Recent Amendments to the Commodities Exchange Act and the CFTC Implementing Regulations Confirm that the Client Agreements at Issue in the Present Case Are Governed by the Dispute Resolution Procedures Contained in 17 CFR s. 166.5.**

The CFTC was created in the 1970's to assist in the regulation of the commodities and futures markets pursuant to the Commodities Exchange Act. *See Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 567 F.2d. 1175 (2d Cir. 1977). Shortly after its creation, in 1975, the CFTC undertook an examination of the use of arbitration in the futures industry. *Id.* at 1178. Through this process, it learned that in many cases arbitration was not undertaken voluntarily by customers, but that customers were being compelled to agree to predispute arbitration clauses as a precondition to doing business and that this practice was so prevalent that customers were being frozen out of the futures market if they refused to execute a predispute arbitration agreement. *Id.* (*citing* 41 Fed.Reg. 27,526 (July 2, 1976); 41 Fed.Reg. 42,945 (Sept. 29, 1976)). Based upon these findings, the CFTC created a regulation, 17 C.F.R. § 180.3, establishing several procedural protections for consumers to ensure that any agreement to submit disputes to arbitration was truly voluntary on the part of the customer. *Id.* at 1179 (*citing* 42 Fed.Reg. 27,526-28 (July 2, 1976)). Specifically, 17 C.F.R. § 180.3 provided, among other things: 1) that signing the agreement could not be made a condition of access to the market; 2) that the customer had to sign separately the clause providing for arbitration; and 3) that there had to be a warning in bold-face type that the customer is giving up certain rights to assert his claim in court in the agreement signed by the customer.  17 C.F.R. § 180.3 (2000).

At the time the CFTC created 17 C.F.R. § 180.3 in the 1970's, the CFTC did not have regulatory oversight over retail forex trading contracts, to the extent that a market for such

contracts even existed. The CFTC's oversight of retail forex trading contracts began with Congress's passage of the Commodities Futures Modernization Act in December 2000 ("CFMA"). The CFMA amended the Commodities Exchange Act so as to bring within the regulatory reach of the CFTC certain foreign currency futures contracts, which before then, would have been outside the CFTC's jurisdiction, even if an equivalent contract in wheat or oil would be covered. *Commodities Futures Trading Commission v. Zelener*, 373 F.3d 861 (7th Cir. 2004).

Not only did the CFMA increase the scope of the CFTC's regulatory authority, but the CFTC itself undertook a review of its regulations in light of the CFMA and enacted a series of regulatory reforms in 2001. As a part of these regulatory reforms, the CFTC repealed 17 C.F.R. § 180.3, and in its place promulgated 17 C.F.R. § 166.5. This new regulation, entitled "Dispute Settlement Procedures," contained the same three procedural requirements contained in the prior section 180.3 concerning arbitration agreements. Specifically, 17 C.F.R. § 166.5 provides, among other things: 1) that signing an agreement to submit disputes to arbitration cannot be made a condition of access to the market; 2) that the customer must sign separately the clause providing for arbitration; and 3) that there must be a warning in bold-face type in the agreement that the customer is giving up certain rights to assert his claim in court in the agreement signed by the customer.

At the time the CFTC enacted 17 C.F.R. § 166.5, it intended the regulation to apply to retail forex trading contracts. *See* 17 C.F.R. § 166.5(a)(2010). In fact, it was widely understood that one of the purposes of the CFMA and the CFTC's subsequent regulatory reforms was to provide a measure of consumer protection for individuals entering into the retail forex trading market, a market that had earned a reputation of being the "wild west" of trading up to that point.

*Hearing To Review Implications Of The Cftc V. Zelener Case, Subcommittee On General Farm Commodities And Risk Management Of The Committee On Agriculture House Of Representatives,* 111th Cong. (2009) (Statement Of Daniel Roth, President And Chief Executive Officer, National Futures Association, Chicago, Illinois); *Testimony Of Daniel J. Roth, President And Chief Executive Officer, National Futures Association, and Testimony Of Terrence A. Duffy, Chairman Of Chicago Mercantile Exchange Holdings, Inc., Senate Committee On Banking, Housing, And Urban Affairs  U.S. Senate* (September 8, 2005).   Indeed, FXCM expressly recognized that the parties are governed by the CFTC rules regarding arbitration clauses as both versions of the 2004 Client Agreement attached to FXCM's motion contain explicit references to the Commodities Exchange Act and the CFTC's implementing regulations, including 17 C.F.R. § 180.3.

Notwithstanding the widespread belief that retail forex trading contracts fell within the scope of the CFTC's regulations, the Seventh Circuit threw the industry and consumers a curve-ball in June of 2004.  In *Zelener*, the court found that retail forex contracts were not "futures," but instead "rolling spot contracts," and, as such were outside the reach of the CFTC.  *Zelener*, 373 F.3d at 861.  The Sixth Circuit agreed with *Zelener* in 2008, and several district courts followed suit, as well.  *See, e.g., CFTC v. Erskine*, 512 F.3d 309 (6th Cir. 2008).  The Second Circuit has yet to address this question.

The *Zelener* court's ruling set back the CFTC's Division of Enforcement forex program by a half a decade, according to remarks by Stephenie Jay Obie, Acting Director of the Division of Enforcement of the CFTC in 2009, made to the United States House of Representatives, Committee on Agriculture, Subcommittee on General Farm Commodities and Risk Management. *Hearing To Review Implications Of The Cftc V. Zelener Case, Subcommittee On General Farm*

*Commodities And Risk Management Of The Committee On Agriculture House Of Representatives,* 111th Cong. (2009) (Statement Of Stephen J. Obie, Acting Director, Division on Enforcement, Commodity Futures Trading Commission, Washington, D.C.)  In reaction to these court rulings, Congress enacted what many referred to as the "*Zelener*-fix" in 2008 as a part of the CFTC Reauthorization Act contained within the 2008 Farm Bill.  *Hearing To Review Implementation Of Changes To The Commodity Exchange Act Contained In The 2008 Farm Bill,* 111th Cong. (2009) (statement of hon. Gary Gensler,  Chairman, U.S. Commodity Futures Trading Commission, Washington, D.C.)  The CFTC Reauthorization Act amended the CEA to make it explicitly clear that the CFTC has regulatory authority over the retail forex industry and the kinds of retail forex trading contracts at issue in this case.  *Hearing To Review Implications Of The Cftc V. Zelener Case, Subcommittee On General Farm Commodities And Risk Management Of The Committee On Agriculture House Of Representatives,* 111th Cong. (2009) (Statement Of Stephen J. Obie, Acting Director, Division on Enforcement, Commodity Futures Trading Commission, Washington, D.C.)  Even more recently, in 2010, Congress once again made plain its intent that the CFTC has regulatory authority over retail forex contracts.  In the Dodd-Frank Wall Street Reform and Consumer Protection Act, Congress required the CFTC to enact specific regulations concerning retail forex trading before October 10, 2010, which the CFTC has done.  *See* Pub.L. No. 111–203, Title VII (the Wall Street Transparency and Accountability Act of 2010), § § 701–774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. §§ 1 *et seq.,* and the Regulations promulgated thereunder, 17 C.F.R. § § 1 et seq. (2010).

Applying the procedural protection of 17 C.F.R. § 166.5 to the arbitration clause Defendant now seeks to enforce is consistent with both the parties' expectations at the time the

original contract between Sanders and FXCM was created and with the repeated Congressional enactments confirming that the CFTC has regulatory authority over retail forex trading contracts. The arbitration clauses in both 2004 versions of the Client Agreement expressly incorporate 17 C.F.R. § 180.3, the precursor regulation to the arbitration procedures mandated by 17 C.F.R. § 166.5.   This alone is sufficient to incorporate those regulatory provisions into the contract between the parties even though 17 C.F.R. § 180.3 had been repealed and 17 C.F.R. § 166.5 stood in its stead at the time the contract was created in 2004.  *See Brooks v. Robert Larson Automotive Group, Inc.*, 2009 WL 2853452 (W.D. Wash. Sept. 1, 2009); *Yesterdays Tree, Inc. v. National Grange Mutual Insurance Co.*, 2006 WL 1806467 (W.D.N.C. June 29, 2006).

More importantly, the inclusion of the references to the Commodities Exchange Act and specific CFTC regulations in the parties' 2004 arbitration clause confirms that applying the provisions of 17 C.F.R. § 166.5 to the parties' dispute now would be consistent with their expectations and would not be an invalid retroactive application of law.  As the Supreme Court recognized in *Landgraf v. USI Film Products*, 511 U.S. 244, 269-270 (1994), a statute or regulation "does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law."  Instead, the appropriate question for the court is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.*  In this instance, application of 17 C.F.R. §166.5 to the arbitration clause contained in the contracts between the parties would not attach any new legal consequence to events contemplated before its enactment.  To the contrary, the parties' expectation was that the regulations governing arbitration clauses already applied to their conduct.  While FXCM may have believed in 2005 that the *Zelener* decision relieved it from the obligations of 17 C.F.R. § 166.5, that decision was a surprise change in the law that

Congress later corrected. FXCM could not have reasonably believed in 2004, prior to *Zelener*, that it could ignore 17 C.F.R. § 166.5. FXCM's inclusion of language referencing the old regulations at 17 C.F.R. §§ 180.1-180.5 and parroting some of the required disclosure language shows that FXCM, in reality, thought it was so regulated. In light of these expectations, ignoring the unexpected bump in the regulatory road brought by *Zelener* does not equate to an invalid retroactive application of the regulation existing now imposing the same procedural requirements today that the parties believed to be in existence when they formed their original contract.

The Supreme Court has recognized that procedural changes in the forum in which a dispute will be litigated do not result in a retroactive change in substantive rights. In *Landgraf*, the Court noted that it has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Id.* at 274. The Court reasoned that "[a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" *Id.* In other words, a change in jurisdiction is merely a procedural change in the forum; it does not retroactively impact substantive rights. The Supreme Court has further determined that arbitration agreements do not impact substantive rights. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."); *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 486 (1989) ("resort to the arbitration process does not inherently undermine any of the substantive rights afforded to petitioners under the Securities Act."). Other courts have similarly recognized that arbitration agreements are procedural, and not substantive, in nature. *See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.*, 191 F.3d 198, 205–06 (2d Cir.1999) ("the

substantive rights found in the statute are not in any way diminished by our holding that arbitration may be compelled in this case, since only the forum—an arbitral rather than a judicial one—is affected, and plaintiff's rights may be as fully vindicated in the former as in the latter."). Recognizing the import of the holdings in *Landgraf* and *Gilmer*, at least one District Court has determined that application of a statutory ban on arbitration to a pre-existing agreement is not a retroactive application of law affecting a substantive right.  *See Pezza v. Investors Capital Corp.*, 2011 WL 767982 (D. Mass. 2011).   Likewise, in the instant case, the application of the requirements of 17 C.F.R. § 166.5 to the arbitration clauses in the 2004 and 2005 Client Agreements is merely a procedural change in the tribunal, and does not result in a change or removal of substantive rights of the parties.

Based on the foregoing, 17 C.F.R. § 166.5 applies to the arbitration clauses in question.

**B.      Neither of the Arbitration Clauses at Issue in the Present Case Comply with the CFTC Dispute Resolution Procedures and Are Therefore Unenforceable.**

Neither the version of the arbitration clause found in the 2004 Client Agreements nor the arbitration clause in the 2005 Client Agreement complies with the requirements of 17 C.F.R. § 166.5 or its predecessor regulation found at 17 C.F.R. §180.3.  In particular, Sanders did not separately sign the clause providing for arbitration and the warning required by the regulations was not in large, bold-face type.  Similarly, it appears from Exhibit 2 attached to FXCM's motion that Sanders and similarly situated customers were led to believe their ability to open an account was conditioned upon agreeing to arbitration.

Not only does FXCM's arbitration agreement fail to contain the required cautionary language in boldfaced type as mandated by the federal regulations, it does nothing to distinguish the arbitration agreement from any other provision of its six-page Client Agreement.  The arbitration agreement is embedded in, and not separate from, the remainder of the Client

Agreement, without any separate endorsement as required by 17 C.F.R. 166.5(c)(2).   The regulations also provide that signing an arbitration agreement may not be a condition for the consumer to utilize the offered services. 17 C.F.R. 166.5(c)(1).  FXCM's procedure by which its customers are presented with a "yes" or "no" check box on its website concerning arbitration, surrounded by other check boxes which are required to be checked to open the account, does not constitute a separate endorsement of the arbitration agreement.  See Exhibit 2 to Affidavit. FXCM's web form does not make clear to the consumer that he or she is not required to check "Yes" to arbitration in order to use FXCM's services.   Instead, by making the arbitration agreement inconspicuous and making it appear to the consumer as though all check boxes are required to be checked "Yes" in order to open an FXCM retail forex trading account, FXCM failed to comply with the requirements of the regulation.

The 2005 version of the arbitration clause likewise fails to comply with the boldfaced type requirements of 17 C.F.R. § 166.5 and, like the 2004 version, the arbitration clause was embedded deep within the Client Agreement, on the last page, and not separately endorsed by Sanders, also is in violation of the regulation.  Even worse than in 2004, FXCM simply cannot argue that it obtained affirmative consent from Sanders to the 2005 arbitration clause.  As discussed in more detail below, FXCM unilaterally imposed the 2005 arbitration clause with no notice whatsoever to Sanders pursuant to a "revised" modification clause.  In light of these facts, the 2005 arbitration clause was not even remotely obtained with "consent" that was knowing or voluntary, and thus runs afoul of the regulation.

Accordingly, because FXCM's arbitration agreement does not contain the cautionary language in boldface type and is not separately endorsed, and does not make clear that acceptance of arbitration is not a condition of opening an account; FXCM's arbitration

agreement is facially invalid.  *David v. Merrill Lynch, Pierce, Fenner and Smith*, 440 N.W.2d 269, 273 (N.D. 1989) (citing 41 Fed.Reg. 42943); *Markowitz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 430 N.Y.S.2d 774, 775 (N.Y.Sup. 1980) (citing *Ames v. Merrill Lynch, Pierce and Smith*, 567 F.2d 1174 (2nd Cir.) ("It is clear from an examination of the agreement between the parties that the arbitration clause does not conform to s 180.3." "All arbitration agreements which do not conform to s 180.3, whether they were entered into prior to or after its effective date, are a nullity."); *Shearson Hayden Stone, Inc. v. Protzko*, 296 N.W.2d 224, 225 (Mich.App. 1980).

## II.   THE ARBITRATION CLAUSE DEFENDANT SEEKS TO ENFORCE IS INVALID BECAUSE IT IS BOTH PROCEDURALLY AND SUBSTANTIVELY UNCONSCIONABLE.

Even in the absence of any controlling regulatory authority, the arbitration clause FXCM seeks to enforce is both procedurally and substantively unconscionable under applicable New York law and as such cannot justify this Court compelling arbitration.

"A court asked to stay proceedings pending arbitration in a case covered by the Act has essentially four tasks: first it must determine whether the parties agreed to arbitrate; second it must determine the scope of that arbitration; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be non-arbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987); *see also Kurz v. Chase Manhattan Bank USA, N.A.*, 319 F.Supp.2d 457, 461 (S.D.N.Y. 2004).

Though the interpretation of an arbitration agreement is governed by the federal substantive law of arbitration, the court must determine first whether the parties entered into a

binding contract to arbitrate. *Specht v. Netscape Communications Corp.*, 150 F.Supp.2d. 585, 589 (S.D.N.Y. 2001). While the FAA expresses a policy favoring arbitration, in enacting the FAA, Congress' intent "was to make arbitration agreements as enforceable as other contracts, *but not more so.*" *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel,* 346 F.3d 360, 366 (2d Cir.2003).    As a result, "while the FAA creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act,' in evaluating whether the parties have entered into a valid arbitration agreement, the court must look to state law principles." *Id.* (internal citations omitted).  In deciding whether the parties had a valid arbitration agreement, courts apply ordinary state law principals that govern the formation of contracts. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995); *see also Bell v. Cendant Corp.,* 293 F.3d 563, 566 (2d Cir. 1993).  Here, the Client Agreement entered into by the parties in 2004 contains a New York choice of law provision, and Plaintiff asserts New York state law pendent claims in his Complaint against Defendant.

The FAA does not require a court to compel arbitration if the arbitration provision at issue is invalid on "such grounds as exist at law or in equity for the revocation of any contract." *Fensterstock v. Education Finance Partners* 618 F.Supp.2d 276, 278 (S.D.N.Y. 2009). Thus, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements" in accordance with the FAA. *Id.* (quoting *Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)). "[Q]uestions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Cap Gemini Ernst & Young, U.S., L.L.C.* 346 F.3d at 364 (noting that inquiry into enforceability of arbitration clause preceded question of whether that clause could refer the issue of arbitrability to the

arbitrators). If, after assessing the validity of an arbitration agreement, the court finds the arbitration provision is unconscionable, the court may not compel arbitration. *See Nayal v. HIP Network Services IPA, Inc.*, 620 F.Supp.2d 566, 570 (S.D.N.Y. 2009).

Under New York law, a contractual provision is unconscionable when it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms." *Nayal* 620 F.Supp.2d at 570 (citing *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 537 N.Y.S.2d 787, 534 N.E.2d 824, 828 (1988). In general, in order to prove a particular contractual provision is unconscionable, a party must show the provision is both procedurally and substantively unconscionable. "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract, per se." *Nayal* 620 F.Supp.2d at 570 (quoting *State v. Wolowitz,* 96 A.D.2d 47, 468 N.Y.S.2d 131, 145 (1983)).

Here, Plaintiff challenges the validity and existence of the subject arbitration clause(s), which requires a judicial assessment of contract law that must be decided prior to this Court's compelling the parties to arbitrate and prior to referring the issue of arbitrability to the arbitrators. *Nackel,* 346 F.3d at 364; *see also Nichols v. Washington Mutual Bank, et. al.,* 2007 WL 4198252 at * 7 (E.D.N.Y. 2007) (citing *Nackel,* 346 F.3d at 366 (stating challenges to the existence and validity of an arbitration clause itself are exclusively within the purview of this Court, and not with the arbitrator); *Brennan v. Bally Total Fitness,* 153 F.Supp.2d 408, 414 (S.D.N.Y. 2001) (stating a challenge aimed exclusively at the arbitration agreement and not the entire contract falls within a district court's jurisdiction).

A.   **The Method by Which FXCM Obtained Plaintiff's "Consent" for and Purportedly Modified the Parties' Arbitration Clause to That Contained in the 2005 Client Agreement is Procedurally Unconscionable.**

The method by which FXCM obtained Plaintiff's purported consent to arbitrate, and then purportedly modified Sanders' contract to include the arbitration clause it seeks to enforce now, is procedurally unconscionable.   Sanders applied for an account with FXCM on or around January 1, 2004, and FXCM attaches the specific Client Agreement in effect at that time as Exhibit 3 to its motion.  FXCM does not request this Court to compel arbitration on the basis of the January 2004 version of the Client Agreement, however.  Instead, FXCM asks this Court to enforce an arbitration clause found in Exhibit 5 to its motion, a Client Agreement effective, according to FXCM, as of December 13, 2005.

As discussed more fully above, FXCM never obtained Plaintiff's knowing and voluntary consent to arbitrate when Plaintiff opened his FXCM account in January 2004.  The check box acknowledgment on FXCM's web form did not make clear that Sanders need not agree to arbitration to open an account with FXCM.  FXCM's procedure by which its customers are presented with a "yes" or "no" check box on its website concerning arbitration, surrounded by other check boxes which are required to be checked to open the account, also does not constitute a separate endorsement of the arbitration agreement required by CFTC regulations.  See Exhibit 2 to Affidavit.  By making the arbitration agreement inconspicuous and making it appear to the consumer as though all check boxes were required to be checked "Yes" in order to sign up for FXCM accounts, FXCM obtained "consent" that was neither knowing nor voluntary.   In addition, the client agreement fails to use bold-faced type or any distinguishing feature to emphasize the arbitration clause from other clauses in FXCM's six-page Client Agreement, making it likely that FXCM's essential requirement that Plaintiff and other customers arbitrate

their claims would go unnoticed. This flies in the face of federal policy that consent to arbitrate be voluntary.

FXCM does not assert that Sanders affirmatively agreed to be bound by the December 13, 2005, version of the Client Agreement or agreed to the specific arbitration clause contained within it. Instead, FXCM cites to a "Modification Clause," in the January 2004 Client Agreement in effect at the time Sanders submitted his account application. This modification clause states

> MODIFICATIONS TO THE AGREEMENT. FXCM reserves the right to change and/or modify any and all terms of this Agreement upon notice to the Trader provided in accordance with the terms of this Agreement ("Notice of Modification"). Trader's failure to object, in writing, within seven (7) business days of delivery of such Notice of Modification shall be deemed Trader's full acceptance of the modifications set forth in the Notice of Modification.

According to FXCM, it "modified" Sanders' then existing Client Agreement by invoking its rights to do under this clause and that as of August 2004, Sanders' Client Agreement was changed to contain yet a different modification clause contained in Exhibit 4. FXCM claims that this "revised" modification clause granted it the right to change unilaterally the terms of Sanders' contact with no notice to Sanders whatsoever. Instead, the burden shifted to Sanders, according to FXCM, to periodically check the FXCM website to determine if any changes had been made to the Client Agreement. Under this "revised" modification clause, Sanders could not reject any such modifications should he happen upon them when reviewing the FXCM website. To the contrary, Sanders was deemed to have agreed in advance to any modifications FXCM should decide to make to the Client Agreement. This "revised" modification clause states:

> FXCM reserves the right to change the terms and conditions of this Agreement from time to time, and at any time, with or without notice to Trader, by posting such changes on the www.fxcm.com website. Trader is responsible for regularly reviewing these terms and conditions and agrees to be bound by same.

Based upon this "revised" modification clause, Defendant claims that it modified Sanders' Client Agreement yet again, this time on or about December 13, 2005, to include a different arbitration provision from that contained in the Client Agreement effective when Sanders applied for his account in January 2004.

This method of first revising the terms of the "modification" clause and then using that revision to sneak changes into the arbitration clause past Sanders with no notice to him is procedurally unconscionable.  In some circumstances, parties can agree in advance that one party can make unilateral alterations to a contract, but even in that instance, the other party must be given some notice of the change.  FXCM's revision to the modification provision purporting to give it the right to make unilateral changes without giving any meaningful notice to the other party is procedurally unconscionable.

The procedural unconscionability is only made worse where the arbitration clause FXCM seeks to enforce contains several substantive changes that materially alter the operation and effect of the arbitration clause.  Under the 2005 arbitration clause, disputes are to be arbitrated under the NFA's Code of Arbitration, which creates significant limitations on Plaintiff's substantive rights, including what FXCM asserts is a ban on Plaintiff's ability to arbitrate class claims and a two year limitations period to bring claims, none of which was present in the arbitration agreement in effect when Sanders submitted his account application.   In addition, there are significant costs imposed by the NFA Code of Arbitration, which fees are not made clear by either the arbitration agreement in place when Sanders submitted his account application – which makes no mention of the NFA – and the December 15, 2005 arbitration agreement, which does reference the NFA rules.

Finally, the method by which FXCM purportedly changed the arbitration clause in 2005 is procedurally unconscionable because it did not require any consent on the part of Sanders where consent to changes was contemplated by the parties in their original agreement.   While Sanders may have indicated assent to the original Client Agreement when he submitted his on-line application, "he did not approve, sign, or otherwise consent to any subsequent unilateral modifications."  Consequently,  the modification  in 2005 purporting  to allow  unilateral modifications without notice was without consideration and, therefore ineffective.   *Brennan*, 153 F. Supp.2d at 415.   Where Sanders did not receive proper notice of, or acquiesce to, the subject modification, that modification should not be enforced against him. *Brennan*, 153 F. Supp.2d at 415 (stating "[B]asic principles of interpretation require that [contracts] be construed against the drafting party.").   *Id.* (citing *Board of Educ. v. CNA Ins. Co.,* 839 F.2d 14, 18 (2d Cir.1988).   In addition, it is a general rule that "in the case of total repugnancy between two contract clauses, the first of such clauses shall be received, and the subsequent one rejected." *Id.* (citing *Honigsbaum's, Inc. v. Stuyvesant Plaza, Inc.* 178 A.D.2d 702, 577 N.Y.S.2d 165, 166 (3rd Dep't 1991); *see* *416 *also Liang v. Huang*, 255 A.D.2d 671, 679 N.Y.S.2d 210, 212 (3rd Dep't 1998)).

Finally, for the same reasons that the arbitration clause FXCM seeks to enforce runs afoul of 17 C.F.R. § 166.5, the methods used by FXCM to purportedly obtain Sanders' consent to the arbitration clause contained in the 2004 Client Agreement are procedurally unconscionable. FXCM buried the terms of the arbitration agreement at the bottom of the Client Agreement which it apparently displayed on a webpage as a part of the on-line account application process. Furthermore, the method of displaying a series of yes/no check boxes on a web form made it appear to customers that all of the boxes had to be checked "yes," including the one relating to

arbitration, thereby improperly making it appear acceptance of an agreement to arbitration was a condition to opening an account.  Given that the first arbitration agreement was obtained through procedurally unconscionable methods, attempting to cure those deficiencies through the unconscionable process of "revising" the modification clause and then unilaterally changing the arbitration clause without notice to Sanders is likewise procedurally unconscionable.

**B.  The Arbitration Clause FXCM Seeks to Enforce is Substantively Unconscionable.**

The 2005 arbitration clause FXCM seeks to enforce indicates that any resulting arbitration will be conducted in accordance with the NFA's Code of Arbitration.  The inclusion of the NFA rules renders the 2005 arbitration clause substantively unconscionable.  Specifically, the NFA Code of Arbitration includes a two-year limitations period, which infringes upon Sanders' and potential class members' ability to prosecute the fraudulent conduct alleged in this case.  According to the Complaint, FXCM's illegal conduct was actively and fraudulently concealed and undetectable by Sanders or putative class members even through the exercise of due diligence.  Based upon these allegations, contained in paragraphs 36 through 44, Sanders seeks relief from illegal conduct occurring well outside the two-year limitations period for NFA arbitrations.  Indeed, without the ability to rely on thee allegations of FXCM's active and fraudulent concealment, Sanders and putative class members will be significantly impaired in their ability to seek redress for the hidden fraud that victimized them.  Not only does the application of this rule unfairly and unconscionably deprive Sanders of the ability to seek redress on his own behalf, but it serves to exculpate FXCM from its clever and undetectable fraud in contravention of the policy goals of both the RICO statute and the New York General Business law.

According to FXCM, the NFA Code of Arbitration does not permit class actions. If true, such a limitation is clearly substantively unconscionable. As FXCM acknowledges, this issue has been settled in the Second Circuit, *Fensterstock v. Education Finance Partners*, 611 F.3d 124 (2d Cir. 2010) and *In re American Express Merchants' Litigation*, 2011 WL 781698 (2d Cir. 2011). As these cases recognize, when a ban on class actions in an arbitration clause acts as a bar to the commencement of a claim for the misconduct alleged, arbitration should not be compelled. In this circumstance, the ban on class arbitration serves not only to eliminate the substantive remedies of Sanders and potential class members, but also acts to exculpate FXCM from wrongdoing. Many of the cases recognizing this principal involve small dollar amounts in controversy, as the practical impediments to a plaintiff's asserting a claim, whether in court or by arbitration, on an individual basis rises as the dollar amount in controversy falls. Stated another way, no rational plaintiff would assert an individual claim against a well-funded defendant for a $5 claim. Thus, absent the ability to aggregate claims through the class vehicle, no one suffering such a dollar loss would ever seek to vindicate his or her rights. In that instance, a ban on class actions in arbitrations means that sending a case to arbitration will effectively preclude anyone from bringing claims and will serve to exculpate a defendant from liability.

In the present case, Sanders has alleged he has potentially lost over $150,000 by virtue of FXCM's conduct. While this loss is not insignificant, it does not mean that he and potential class members would be able to vindicate their rights on an individual basis without the availability of a class action. There are significant evidentiary hurdles to Sanders' claims, not only for purposes of providing the requisite RICO elements, but also in proving that FXCM's conduct caused each of the losses he claims. Due to the complexity of issues in this litigation, Sanders anticipates engaging in voluminous discovery, fronting costly expert expenses, and

18

taking significant risk in an attempt to successfully prosecute his and similarly situated claims. The costs attendant to this litigation could very well exceed the potential recovery if litigated on an individual basis. Thus, from his individual perspective, he would not necessarily be willing or able to prosecute his specific claims without the ability to aggregate such claims in a putative class action. *See Kristian v. Comcast Corp.* 446 F.3d 25, 54 -55 (1st Cir. 2006).

Moreover, the appropriate inquiry is not just whether the named plaintiff would be able to bring his or her claims absent a class action, but whether class members as a whole would be able to vindicate their rights if left with individual arbitrations as the only avenue to do so.  In this case, Sanders believes there is a wide range of potential losses among class members, with many individuals losing perhaps only thousands or tens of thousands of dollar, while others may have suffered more significant losses in the six plus figures.  Without the availability of the class action vehicle, all class members will not be able to vindicate their claims.  Accordingly, if class claims are not arbitrable as FXCM argues, then the enforcement of the 2005 arbitration clause clearly is substantively unconscionable.

Finally, there are significant costs imposed by the NFA Code of Arbitration, which costs are not made clear by either the arbitration agreement in place when Sanders submitted his account application – which does makes no mention of the NFA – and the December 15, 2005 arbitration agreement, which does reference the NFA rules, but does not mention costs.  For those individuals with potentially large losses, these substantial costs serve as a substantively unconscionable barrier to brining their claims.

III.   **BEFORE THE COURT MANDATES ARBITRATION UNDER THE CLAUSE FXCM SEEKS TO ENFORCE, THE COURT SHOULD PROVIDE PLAINTIFF WITH AN OPPORUTNITY TO TAKE LIMITED DISCOVERY CONCERNING THE UNCONSCIONABILITY OF THE ARBITRATION CLAUSE.**

Courts have recognized that the fact intensive inquiry regarding the validity of an arbitration provision can require limited discovery.   Such focused discovery serves to clarify disputed issues of fact and to develop the factual record necessary for the Court to determine whether an arbitration provision is unconscionable.   *Brennan* 153 F.Supp.2d at 416 (citing *Matter of Friedman,* 64 A.D.2d 70, 407 N.Y.S.2d 999, 1008 (2nd Dep't 1978)) (Unconscionability must be determined in light of "the facts and circumstances of a particular case.")).   *See also Hayes v. County Bank*, 728 N.Y.S.2d 709 (2nd Dep't 2001).   (recognizing that the question of whether a valid arbitration was formed is an issue of fact that may require further discovery prior to ruling on a motion to compel arbitration).   Should discovery be warranted prior to determining whether the Motion is appropriate, then the Motion should not be granted.   *See e.g, Brennan,* F.Supp.2d at 416 and *Hayes* 728 N.Y.S. at 709.

Defendant's memorandum in support of its Motion including the attached Declaration of David S. Sassoon and attached exhibits—the Declartion contains numerous factual assertions which raise questions of fact as to whether Plaintiff entered into a mutually assented to and enforceable arbitration agreement.   As described herein, questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved prior to any order compelling arbitration.   To prove a particular contractual provision is unconscionable, a party must show the provision is both procedurally and substantively unconscionable, which requires an intensive factual examination of the evidence in a particular case.   *Nayal* 620 F.Supp.2d at 570 (quoting *State v. Wolowitz,* 468 N.Y.S.2d at 145).   Here, in order to conduct this fact intensive examination, Plaintiff proposes to conduct limited discovery for the purpose of

evaluating whether Plaintiff entered into a valid agreement to arbitrate his claims against FXCM and to determine whether the terms of FXCM's arbitration agreement are enforceable.

While FXCM contends that "Plaintiff affirmatively acknowledged and agreed to the arbitration provision by clicking the "Yes" box next to the words "Arbitration Agreement," in order to adequately respond, Plaintiff requires discovery concerning whether and the manner in which the arbitration agreement was displayed on FXCM's website and presented to Plaintiff; whether and the manner in which the modifications to FXCM's arbitration agreement were communicated to Plaintiff; the legitimacy of FXCM's subsequent unilateral modifications to the arbitration agreement; and, the number of consumers who have clicked "No" and effectively opted out of FXCM's arbitration agreement.

In addition, as to the issue of whether FXCM's arbitration agreement is enforceable, Plaintiff seeks discovery regarding issues such as the number of consumers who have ever proceeded with arbitration or received an arbitration award on the basis of the conduct challenged by this lawsuit; whether a reasonable consumer would believe that he or she could trade with FXCM without assenting to the arbitration agreement; whether Plaintiff was required to establish his FXCM account prior to being shown its arbitration agreement; each modification to the arbitration agreement made subsequent to Sanders' signing up with FXCM; and, whether FXCM negotiated with Plaintiff concerning the terms of its arbitration agreement.

Further, because Sanders was unaware of the subsequent modification clause, he could not comply with his alleged duty to speak and it is inappropriate to consider silence as acquiescence to a contract.  *Matter of Albrecht Chemical Co. (Anderson Trading corp.)* 84 N.E.2d 625 (N.Y. 1949); *See also Diarassouba v. Urban*, 892 N.Y.S. 2d 410 (2nd Dep't 2009).

If discovery reveals Sanders did not receive notice of subsequent modifications, it may be procedurally unconscionable to force subsequent versions of the Client Agreement, including the arbitration provisions within them, upon Plaintiff.  In order to further investigate the procedural unconscionability of the arbitration provision, Plaintiff requires the above-referenced discovery to confirm whether Plaintiff received this required notice and, if so, whether the required notice was adequate.

Sanders challenges the application of this modified arbitration clause to him as FXCM has presented no evidence that it validly modified the terms of Sanders' original 2004 Client Agreement.  Specifically, FXCM does not provide the Court with any evidence that it provided Sanders with the proper notice required by the Modification Clause in effect when Sanders opened his account with FXCM.  In contrast, according to the attached affidavit of William H. Sanders, he has no recollection of receiving such notice and does not recall whether his Client Agreement was modified in 2004, or at anytime thereafter.  Moreover, FXCM does not provide the Court with any evidence that it made the December 15, 2005, revised Client Agreement available on its website at www.fxcm.com for Sanders to view.  To the contrary, based upon Sanders' investigation to date, he believes the December 2005 Client Agreement would have been available for his review on the FXCM website only if he had started the process of opening a new on-line account in 2005, which he had no reason to do.   Thus, based upon the evidence provided by FXCM so far, FXCM has failed to demonstrate that Sanders' Client Agreement was validly amended to include the specific arbitration provision that it now asks this Court to enforce against him.  At best, according to the evidence submitted by Defendant in support of its Motion, which is disputed by Sanders as described herein, Sanders may have agreed to the otherwise invalid arbitration provisions contained in the Client Agreement displayed to him at

the time he applied for an account in January of 2004, but Defendant's evidence fails to show that Sanders agreed to any of the subsequent modifications to that Client Agreement.

In light of the foregoing, in order to investigate the validity of the arbitration agreement, Plaintiff requires discovery specifically relating to the notice Defendant was required to send Plaintiff in order to impose the December 15, 2005 modification.  This includes how notice was sent (via mail, internet, hand delivery, telephone call, or any other source) and where notice was sent (Plaintiff's e-mail address, Plaintiff's home address, or any other location).  In addition, Plaintiff requires discovery regarding the sufficiency of FXCM's notice of the modification(s), including whether the notice provided direction sufficient for Plaintiff to navigate his way to the modifications and, once there, to understand and acknowledge the modification(s).  This includes discovery regarding whether he was simply instructed to view Defendant's website, whether he was given explicit instructions where to find the modification, whether the notice included information regarding content of the modifications and whether there was any confirmation that Plaintiff received notice of the modification(s).

As a result, if the Court is not inclined to summarily deny FXCM's motion, Sanders requires discovery relating to whether he was given the appropriate notice in order to examine the validity and applicability of the December 15, 2005 agreement as Sanders cannot be compelled to arbitrate a provision to which he had improper notice and no knowledge.

## IV.   CONCLUSION

Plaintiff believes that a 90-day extension of time to respond to FXCM's motion to compel arbitration will allow Plaintiff sufficient time to engage in the limited discovery described above and to respond to FXCM's motion to compel arbitration.

Dated: April 25, 2011

**MORGAN & MORGAN, P.A.**
**Business Trial Group**

By: */s/ Damien H. Prosser*
Tucker H. Byrd, Esq.
Florida Bar No. 381632
Damien H. Prosser, Esq.
20 N. Orange Avenue, Suite 1600
Orlando, FL  32801
Email: TByrd@BusinessTrialGroup.com
Email: DProsser@BusinessTrialGroup.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to all counsel of record via filing with the Court's CM/ECF system this 25th day of April, 2011.

*/s/ Damien H. Prosser*
Damien H. Prosser
